UNITED STATES of America, Plaintiff,

v.

Thomas K. DOHERTY, Nelson E. Barner, Nicholas Salerno, Arthur J. Pino, Robert W. Clemente, Sr., John A. Deliere, and Michael J. Doherty, Defendants.

Crim. A. No. 86–240–Y.

United States District Court,
D. Massachusetts.

June 2, 1987.

---

Robert S. Mueller, III and A. John Pappalardo, Asst. U.S. Attys., Boston, Mass., for plaintiff.

Richard Bachman, Thomas May, Michael Collora, Thomas Troy, Frederick Harris, Richard Egbert, George Gormley, Boston, Mass., Frank Marchetti, Somerville, Mass., Thomas Noone, Malden, Mass., Joseph Flak and Thomas Finnerty, Boston, Mass., for defendants.

## MEMORANDUM OF DECISION

YOUNG, District Judge.

On May 7, 1987, the jury returned its verdict in the above-captioned matter after a seventeen week trial. As soon as the verdict had been returned, News Group Boston, Inc. (the "Herald") and the Globe Newspaper Company (the "Globe") came before the Court seeking to intervene at the post-verdict stage of this criminal prosecution in order to gain access to the names and addresses of the jury for the purpose of conducting post-verdict interviews. The jurors' names and addresses

had been impounded during the course of the trial and were known only to the litigants and their counsel. The motions to intervene were granted, *see United States v. Criden*, 675 F.2d 550, 559 (3d Cir.1982) (requiring that motion requesting closure be entered on the docket to afford interested members of the public an opportunity to intervene and present their views to the court); *In re Globe Newspaper Co.*, 729 F.2d 47, 50 n. 2 (1st Cir.1984) (citing *Criden* but not deciding whether a media representative may intervene in a criminal action for the purpose of appealing a closure order and instead invoking mandamus review), and, for the reasons set forth in this memorandum, the motions for access to the jurors' names and addresses were granted subject to limitations.

## THE FACTS

On May 7, 1987, after eight days of deliberation and on the sixty-second day since the commencement of trial, the jury found Thomas K. Doherty, Nelson E. Barner, Nicholas Salerno, Arthur J. Pino, Robert W. Clemente, Sr., and John A. Deliere guilty of various counts of conspiracy to commit mail fraud and certain defendants guilty on other counts alleging perjury and conduct in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68 (1982). One defendant, Michael J. Doherty, was found not guilty on all counts against him.[1]

On January 12, 1987, as the trial commenced, this Court had entered a sequestration order that required that the jurors be secluded from all outside contact while they were present in the courthouse. The jurors were admonished daily not to discuss the case with anyone, not to watch any television, listen to any radio, or read any newspaper accounts of the trial. Finally, the names and addresses of the jurors were impounded from the empanelment process and throughout the course of the trial.

---

1. Thomas K. Doherty was also found not guilty on one count involving an alleged conspiracy to commit mail fraud with his son, Michael J. Doherty. Three additional defendants, Gerald

W. Clemente, Jr., John A. Madden, and Frank Ray, who were named in the indictment, had previously entered pleas of guilty.

Once the verdict had been received, with the jury still in the courtroom just prior to its being discharged, this Court suggested to the members of the jury that while they were now free to discuss the case with members of the public, including the press, they ought refrain from discussing the actual deliberation process. Thereafter, once the jury had been discharged, the courtroom staff and I met informally with the jurors in the jury room to thank them personally for their lengthy service and to answer their questions about court procedures. At this time, the jurors expressed their unanimous desire not to have their names and home addresses disclosed to the press.

As the jurors departed for the hotel where they had been sequestered during their eight days of deliberations, and thence home by taxi, this Court commenced the hearing at which briefs and arguments from counsel for the two newspapers were entertained. The newspapers sought to have the impoundment order vacated and the names and addresses of the jurors released immediately—while the public's attention was still focused intently on the "jury's performance of its public duties." Memorandum of Globe Newspaper Co., at 3.

DISCUSSION

"[R]ights," as Mr. Justice Holmes observed, "tend to declare themselves absolute to their logical extreme." *Hudson Water Co. v. McCarter*, 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908). The issue here presented requires this Court to resolve the tensions posed by what appear to be the inherently competing interests advanced by the public's First Amendment right of access to criminal proceedings through the operation of a free press, the accused's Sixth Amendment right to a fair trial before an impartial jury, and the judiciary's legitimate concern for, as well as the individual juror's right to, personal privacy.

I.

In *Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626

(1972), the Supreme Court recognized that news gathering qualifies for First Amendment protection, for "without some protection for seeking out the news, freedom of the press could be eviscerated." Since that decision, the Supreme Court has added substance to that access right by recognizing rights of access to criminal trials, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the voir dire examination of potential jurors, *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (" *Press–Enterprise I* "), and most recently, the transcript of a preliminary hearing before the public trial. *Press–Enterprise Co. v. Superior Court*, —— U.S. ——, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("*Press–Enterprise II* ").

■ In *Press–Enterprise II*, the Supreme Court reviewed its two-part test for determining whether a right of access is implicated. First, have the place and process historically been open to the press and general public? Second, will public access play a significant, positive role in the functioning of the particular process in question? 54 U.S.L.W. at 4871. If the particular proceeding—in this case, post-verdict press inquiries of jurors—passes these tests, a right of public access attaches. Once attached, however, the right is not absolute. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982); *see Zemel v. Rusk*, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1280–81, 14 L.Ed.2d 179 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information." ). Unlike prior restraints, which are generally unconstitutional per se, *Gannett Co. v. DePasquale*, 443 U.S. 368, 393 n. 25, 99 S.Ct. 2898, 2912 n. 25, 61 L.Ed.2d 608 (1979); *In re Providence Journal Co.*, 809 F.2d 63, 69 (1st Cir.1986) (where prior restraint impinges on pure speech the presumption of unconstitutionality is virtually insurmountable), limitations on a right of access will be upheld where the court de-

termines, based upon adequate findings, that an overriding interest narrowly tailored to the circumstances at hand overcomes the First Amendment right. *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. at 824.

## II.

Here, the Court notes as a preliminary matter that it is inconsequential whether the post-verdict interviews are considered part of the criminal trial for purposes of the right to access analysis. As Mr. Justice Stevens' concurring opinion in *Press–Enterprise I* noted, "the distinction between trials and other official proceedings is not necessarily dispositive, or even important, in evaluating the First Amendment issues.... [The] question the Court decides today ... focuses on First ... Amendment values and the historical backdrop against which the First Amendment was enacted." *Press–Enterprise I*, 464 U.S. at 516–17, 104 S.Ct. at 827 (Stevens, J., concurring).

█ The first aspect of this Court's analysis of the First Amendment values at issue requires an inquiry into history. What, if anything, is our American tradition concerning accessability of the jurors to the press for post-verdict interviews? It is beyond peradventure that the actual deliberations of a jury are private and confidential and not subject to public access. Sharp, *Postverdict Interviews with Jurors*, Case & Comment 3, at 6 n. 18 ("[I]f our several centuries' old faith in the jury system means anything at all, it implies a strong secrecy of the jury room deliberations."). *See generally* O. Holmes, *The Common Law* 122–19 (1881); 3 Blackstone's Commentaries *349 (1768). In the instant case, the more specific issue is, of course, the right of access after the jury deliberations have concluded. In *United States v. Franklin*, 546 F.Supp. 1133, 1139–42 (N.D.Ind.1982) (Sharp, J.),[2] a district court compiled numerous opinions wherein courts have expressed "widespread" concern over post-verdict jury interrogations. *See, e.g., Stein v. New York*, 346 U.S. 156, 178, 73 S.Ct. 1077, 1089, 97 L.Ed. 1522 (1953) ("Nor have the courts favored any *public* or private post-trial inquisition of jurors as to how they reasoned, lest it operate to intimidate, beset and harass them) (emphasis added). *Miller v. United States*, 403 F.2d 77, 81 (2d Cir. 1968):

> [W]e see no basis for doubting the authority of the judge to direct that any interrogation of jurors after a conviction shall be under his supervision.... There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision. The jurors themselves ought not be subject to harrassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain.

While the history of post-verdict interviews appears scant, the broad latitude afforded the press in gathering news, especially in recent years, tends to favor accessability in this area as well. *See Press–Enterprise II*, —— U.S. at ——, 106 S.Ct. at 2747–50 (Stevens, J., dissenting) (noting expansive view of history of accessability in preliminary hearing context taken by Supreme Court). Finally, the Courts of Appeals[3] that have addressed this issue have apparently accepted, sub silentio, that the public's right of access to jurors after the verdict is returned is historically protected.[4]

**2.** For a more developed exegesis of Judge Sharp's views in *Franklin*, see his article, previously cited, in Case & Comment.

**3.** *Journal Publishing Co. v. Mechem*, 801 F.2d 1233 (10th Cir.1986); *In re Express–News Corp.*, 695 F.2d 807 (5th Cir.1982); *United States v. Sherman*, 581 F.2d 1358 (9th Cir.1978).

**4.** The right of the Court to protect the anonymity of the jury through trial, deliberations, and verdict appears undoubted and neither newspaper seeks to challenge it here. Moreover, the Court intuits—but has been unable to find any case which so states—that in cases involving pervasive gangland violence or sustained terrorist activities, the courts may well have asserted unchallenged a continuing authority to protect jury anonymity. While the trial of the instant case revealed an extensive and pervasive pattern of corruption of long standing

■ In any event, the second aspect of the Court's required analysis—whether public access to jurors, post-verdict, plays a particular, significant, positive role in the actual functioning of the process, *Press–Enterprise II*, — U.S. at ——, 106 S.Ct. at 2739—militates in favor of recognition of the right. The processes of the court and its conduct with respect to the selection and protection of the jury during a sequestered trial are areas of concern that the public may well wish to explore and the jurors may well wish to discuss. It is important for the public to receive information about the operation of the administration of justice, including information about the actual people who do render justice in the truest sense of the word. Access to such information not only serves the cause of justice generally by providing an independent, non-governmental verification of the utter impartiality of the processes involved in selecting jurors and shielding them from improper influences, it also serves to enhance the operation of the jury system itself by educating the public as to their own duties and obligations should they be called for jury service. This Court thus concludes that, under the First Amendment, the public has a general right, at some reasonable time after a verdict is delivered, to the names and addresses of the jurors discharging this important public trust.

### III.

■ However much the press might wish it otherwise, though, the First Amendment right to gather news is not absolute. *Press–Enterprise II*, — U.S. at ——, 106 S.Ct. at 2741; *id.* at —— n. 3, 106 S.Ct. at 2741 n. 3 (Stevens, J., dissenting) (collecting cases). Countervailing interests may, under certain circumstances, outweigh First Amendment rights. One such interest is the accused's Sixth Amendment right to a fair trial. In *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Supreme Court stressed that courts must ensure that the integrity of the proceedings be maintained, and that the prejudicial influences and possible "carnival atmosphere" of some courtrooms be removed in order that the accused receive a fair trial by an impartial jury. *Id.* at 362–63, 86 S.Ct. at 1522; *see "Free–Press—Fair Trial,"* 45 F.R.D. 391, 404–13 (1968) (discussing recommendations in light of *Sheppard* for reducing prejudice in sensationalized cases). "When the rights of the

among a few high ranking police officers, there is here not the slightest hint of any retaliation of any sort against the jurors by the present litigants or any other segment of society. Accordingly, while this Court expresses no view as to the reach of its power to protect the anonymity of former jurors where individual security concerns are so implicated, it finds those concerns are not present here.

Before turning from the historical analysis, however, it is appropriate to note that *immediate* unrestricted post verdict access to jurors is contrary to the general norm and historical practice of American courts and this Court takes judicial notice of that fact. Fed.R.Evid. 201. Nowhere in the United States, so far as I am aware, are jurors, after a trial of significant notoriety and a period of sequestration away from their families, forced to endure the immediate withdrawal of assistance from the United States Marshals upon the return of the verdict. Nowhere are such jurors expected to walk a gauntlet of klieg lights in the courthouse lobby, confront a massed phalanx of newspeople with microphones thrust forward like the protostates' sarissa, or be hunted down the courthouse corridors like the fox pursued by the hounds. Such images are common in the executive and legislative branches; their effect on the manner in which our most important public business is conducted is too evident to require elaboration. Within the judicial branch it is different. It is the custom, both in the District of Massachusetts and the Massachusetts Superior Court where I earlier served, for the Marshals or the Court Officers to conduct jurors who have been sequestered but are now discharged after verdict out through the restricted areas of the courthouse to a waiting van or bus which returns them to the hotel where they have been sequestered to collect their belongings. From the hotel, the jurors are given a taxi ride home to their family at government expense. Naturally, any juror is free to confront the press at once should he or she so desire. The point, however, remains that even though the jurors are discharged, they may avail themselves of the care of the Marshals or Court Officers and thus be secure from unwanted inquiry until they rejoin their families and take up their private pursuits. This is a traditional if not historic restriction on the right of the press to have immediate access to those jurors who, next to bearing arms in defense of the nation, have answered the highest calling of American citizenship.

accused and those of the public come irreconcilably into conflict, the accused's Sixth Amendment right to a fair trial must, as a matter of logic, take precedence over the public's First Amendment right of access to pretrial proceedings." *In re Globe Newspaper Co.*, 729 F.2d at 53. Even though an accused's fair trial rights may diminish and appear to evaporate upon the reaching of the jury verdict, the rationale for juror secrecy during deliberations applies equally well to secrecy post-verdict. For one juror to make public the thoughts and deliberations of his or her colleagues in the deliberation room will "chill" the free flowing process that our system encourages, *see Clark v. United States*, 289 U.S. 1, 13, 53 S.Ct. 465, 468, 77 L.Ed. 993 (1933) (Cardozo, J.), especially if other jurors come to believe that it is the accepted practice for jury deliberations to be freely discussed once the verdict is returned. "Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly." *Press–Enterprise II*, —— U.S. at ——, 106 S.Ct. at 2740–41. In the instant case, even though the trial of the specific individuals accused is over, the underpinnings of the jury system and the Sixth Amendment rights of the defendants—especially those of Michael Doherty whom the jury acquitted—are still vitally implicated. *Sharp, supra*, p. 6, at 8. It is for these reasons that it was appropriate for this Court to counsel—though I did not and could not order—that the discharged jurors refrain from discussing their deliberations with anyone.

■ The other, and more immediate interest, implicated at this time is the expressed privacy concerns of the jurors' themselves. As stated above, the Court conducted a poll of the jury at which time they were unanimous in their objection to having their names and addresses revealed to the press. Although this privacy interest is by no means absolute, *see Press–Enterprise I*, 464 U.S. at 511–12, 104 S.Ct. at 824–25 (while jury selection proces may give rise to compelling privacy interest of prospective juror, it must be balanced against historic values of voir dire and openness of criminal trial process), it nonetheless is a compelling interest deserving of protection, especially where there are available narrowly tailored time and scope limitations on the First Amendment access right that is impinged. *See Journal Publishing Co. v. Mechem*, 801 F.2d 1233, 1236–37 (10th Cir.1986) (sweeping "all encompassing restraints" forbidden where no time or scope limitations imposed); *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir.1978) (same); *cf. Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 103 S.Ct. 3524, 77 L.Ed.2d 1284 (1983) (Brennan, J., Circuit Justice) (permanent restraint on printing names and addresses of jurors post-voir dire, which had been open to the public and where the names were not kept confidential, amounted to unreasonable prior restraint especially where no hearing was held and no findings made). This Court has the power, and the duty, to prevent juror harrassment after the trial. *See In re Express–News Corp.*, 695 F.2d 807, 810 (5th Cir.1982). The Court also notes that "[t]he State has a similar interest in protecting juror privacy, *even after trial*—to encourage juror honesty in the future—that almost always will be coextensive with the juror's own privacy interest." *Press–Enterprise I*, 464 U.S. at 515, 104 S.Ct. at 826 (Blackmun, J., concurring) (emphasis added).[5]

## IV.

■ Mindful of these competing interests, and the prior conduct of one party to this hearing,[6] the Court seeks to accommo-

---

5. This Court need not define the scope of the privacy right involved, i.e., whether it is of constitutional magnitude, *see Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), or common law in origin, *see* Warren & Brandeis, *The Right to Privacy*, 4 Harv.L.Rev.

193, 193 (1890) ("Gradually the scope of these legal rights broadened; and now the right to life has come to mean the right to enjoy life, the right to be let alone...").

6. During the course of the jury deliberations in this trial the Globe printed purported personal

date the interests present here so as to promote the values espoused by the First Amendment, specifically through the press' right to access, while protecting the general interests of each of the litigants to a fair trial and, at the same time, minimizing the invasion of the legitimate expectations of privacy of a jury that has served the public long and well. This can best be accomplished by lifting the order of impoundment to reveal the jurors' names and addresses seven days after the verdict has been returned.

The values to be promoted by press access to the names and addresses of the jurors are no less advanced seven days after the return of the verdict. *See United States v. Harrelson,* 713 F.2d 1114 (5th Cir.1983) (upholding limitation that required that press not inquire into specific votes of any juror other than one questioned; prohibited repeated requests for interviews after juror declined; prohibited all interviews until jurors received a copy of the judge's order), *cert. denied,* 465 U.S. 1041, 104 S.Ct. 1318, 79 L.Ed.2d 714. In a case that has received considerable news coverage, where sentencing follows the verdict after a month's interval, and post-trial proceedings are expected, a postponement of one week will not injure the values to be furthered by a searching press inquiry into the lives of the jurors. If the newspapers are seriously interested in confirming the jurors' impartiality, considering whether their individual backgrounds affected their view of the proceedings, or investigating the impact of such a lengthy trial upon a juror's life, that data may be sought out with equal ease when the names and addresses of the jurors are disclosed seven days after the verdict. At the same time, the seven day hiatus affords each juror the chance—without interruption—to catch up on precious time spent away from family, in the service of society, allows each one to resume his or her normal round of activities, and grants to each juror a short breathing space to reflect on the experience of jury service and, after consultation with family and friends, determine what, if anything, the juror wishes to discuss with the press. Lifting the impoundment order seven days after the return of the verdict thus accommodates all the relevant interests without the necessity of balancing one against the other.[7]

## V.

The Court, therefore, granted the motions of the press to lift the impoundment order, but with limitations. In order that the members of the jury might return to their occupations and resume their personal lives, the Court stayed the motion to lift the impoundment until May 15, 1987, by which time the jurors were expected to have received a copy of this Court's order

---

and private information about the reasons why one juror sought to be excused from his juror service during the deliberation process. The actual information had been discussed at an impounded side bar conference and this Court infers that the Globe well knew it was disclosing material the Court had sought to protect to safeguard the personal privacy of the excused juror and his family.

7. At the hearing on this motion the Herald appeared content with the accommodation just discussed. The Globe, however, advances the absolutist view that it has a right to immediate access in order to satisfy the public's interest at a time when it is focused on the most dramatic stage of a jury trial—the return of the verdict. With respect, this is little more than an argument that it wants the information to sell more papers. While this is hardly an ignoble end, it flies in the face of the historic traditions of the courts, does nothing to enhance the jury system (in fact, it may harm it through undue inquiry

into the jury's deliberations), and exposes the jurors to press intrusion when they are most emotionally drained while still separated from family and friends.

While it is not for this Court to evaluate the "newsworthiness" of any information—that, after all, is the essence of censorship—it bears noting that the Globe apparently did not, given the press of other breaking news stories, consider inquiry of the jurors inherently newsworthy, standing alone, apart from the verdict. It ran no story concerning the jury once the impoundment order was lifted, while the Herald followed up the matter and published a brief story purporting to summarize the views of certain jurors about the proceedings. Either the Globe lost interest in the matter when considered in isolation compared to other potential news stories—or the jurors queried refused to talk to Globe reporters.

of May 7, 1987, which consisted of the following:

(1) Any juror may refuse any interview request of him or her;

(2) Should a juror indicate that he or she does not wish to be interviewed, no further inquiry or attempt to seek the interview from that juror will be permitted by that news gathering organization;

(3) No interview may take place until May 15, 1987, when each juror shall have received a copy of this Court's order.