STATE of Delaware

v.

Steven B. PENNELL, Defendant.

Superior Court of Delaware, New Castle County.

Submitted: Dec. 14, 1989.
Decided: March 2, 1990.

---

Peter N. Letang, Kathleen M. Jennings and Jeffrey M. Taschner, of the Dept. of Justice, Wilmington, for the State.

Eugene J. Maurer, Jr., Wilmington, for defendant.

Richard G. Elliott, Jr. and David L. Finger, of Richards, Layton & Finger, Wilmington, for intervenor Gannett Co.

## OPINION

GEBELEIN, Judge.

The defendant in this action had been charged with three counts of First Degree Murder, in what was alleged to be serial killings. The autopsies of victims revealed that in two cases the victim had been struck in the head with a cylindrical object, such as a hammer, had been strangled, had suffered ligature marks on the wrists and ankles, had suffered injuries to the nipples from a pinching-type tool, such as pliers or a vise-grip, and had present the residue of duct tape in the area of the face and hair. The third victim, though not beaten in the head or strangled, had suffered removal of a nipple and bruises to her buttocks (similar to those found on one of the other victims). Finally there was evidence that she, too, had been bound hand and foot at the time of her injuries.

Because of the nature of these crimes and other murders or disappearances for which the defendant was not charged, the case received both national and local press coverage during the investigation as well as during pre-trial and trial proceedings. During the investigation, the local press published details of the crimes, speculated upon additional disappearances and gave warnings to women in the areas concerned. After the defendant's arrest, additional coverage occurred in the local press. A national television show broadcast details of the crimes and ran footage of the defen-

dant's arrest. This coverage occurred upon local television as well.

Early in the prosecution of this case, Gannett sought access to search warrant applications and returns that had been sealed by Justice of the Peace Courts. With a limited exception, those files were opened to the press by this Court. The search warrant return deletion involving personal items of a sexual nature seized by the police from defendant's residence was released after the trial.

At the time of the suppression hearing in this case, March, 1989, the Court had become increasingly sensitive to the amount of media coverage generated by this unique case. Consideration was given at that time to closure of the suppression hearing; but, since the trial was six months away and the Court anticipated that steps could be taken to provide an unbiased jury, the hearing was conducted in open Court. Additional daily news coverage followed. During the summer months, hearings were conducted relating to the evidentiary issues surrounding DNA identification, again daily media coverage followed. These hearings, due to the schedules of expert witnesses, continued to the eve of trial. All of these pretrial proceedings were conducted in an open fashion, guaranteeing the public and the commercial media free access to all that occurred in this proceeding.

On July 28, 1989, this Court entered an administrative order directing the Prothonotary to keep confidential the names of jurors subpoenaed for the petit jury panel in this capital murder case.[1] The order was filed in the Prothonotary's file on July 31, 1989. In September 1989, Gannett Co., Inc., publisher of the *News Journal* (hereinafter, *"News Journal"* or *"Journal"*), moved to intervene and to vacate the order. After an open hearing on these motions, the Court ruled from the bench granting the motion to intervene and denying, at

---

1. The facts of this case, the pre-trial publicity surrounding it and the full text of the order are detailed in *Gannett Co., Inc. v. State,* Del.Supr., 571 A.2d 735 (1989). Subsequent publicity included daily newspaper coverage and almost daily television and radio coverage. In addition, the case was the subject of several tele-

vision special reports. The Courthouse was covered on almost a daily basis by live television and trial participants were routinely photographed going to lunch as well as arriving or leaving the Courthouse. The trial has been called the most sensational in Delaware history by the local news media.

that time, the intervenor's motion to vacate the administrative order.

The bench decision was followed shortly by a written opinion which concluded that the jurors' names were not public records to which the public had access; that the news media had no greater right of access than the public; and that the Court's discretionary authority to invoke confidentiality was permitted by statute and by the Plan of the Superior Court of Delaware for the Random Selection of Grand and Petit Jurors.[2] *State v. Pennell*, Del.Super., Cr. A. Nos. IN88–12–0051–0053, Gebelein, J., 1989 WL 167445 (Oct. 2, 1989).

2. Ten *Del.C.* § 4513(a) provides that, "The names of persons summoned for jury service shall be disclosed to the public and the contents of jury qualification forms completed by them shall be made available to the parties unless the Court determines that any or all of this information should be kept confidential or its use limited in whole or in part in any case or cases." The Plan of the Superior Court of Delaware for the Random Selection of Grand and Petit Jurors § 16 incorporates the basic language of this statute.

3. In particular the Court weighed the dangers of jury contamination or disqualification in the light of the experiences in *State v. Joyce L. Lynch,* Del.Super., Cr. A. Nos. IK88–01–0040–0047, 1989 WL 64149 Ridgely, J., where a juror had to be excused because of the impact of a *News Journal* article:

(Juror No. 11 entered chambers.)

THE COURT: Come in, Mr. Bloodsworth. Have a seat, please.

BY THE COURT:

Q. As you may know there has been a publication by the News Journal paper about information on the jury. I wanted to read to you a portion of the article as it relates to you, and then I will have some questions for you. It reads as follows, "Robert Lee Bloodsworth, 32, Harrington. Tall balding and thin. Has a three-year-old son and two-month-old daughter. He said that wouldn't affect his impartiality given the closeness of the ages of his children to those of the Gibsons."

Will this publication affect your ability to be a fair and impartial juror in this case?

A. Not to my knowledge, no.

\* \* \* \* \* \*

JUROR NO. 11: If it would be possible I would like to go on record saying I am upset by it, in the context that my wife is afraid of *getting* crank phone calls and things of that nature.

The Court also ruled that the case did not involve First Amendment freedom of press issues because the media had no right of access to these records and the order was not a prior restraint order because it did not prohibit the media from publishing anything, but rather prohibited Court personnel from divulging information. *Id.*

In deciding to keep the names confidential, the Court weighed such factors as the defendant's right to a fair trial, the pre-trial publicity, the possibility of harassment of jurors, the possibility that the jury could become contaminated or disqualified[3], and the jurors' privacy rights.

BY THE COURT:

Q. Do you believe this would have any impact upon your ability to serve as a juror in this case?

A. No, not really because we don't talk about it at home. This is the only time that she has mentioned the fact that she is upset by it.

Q. Because of the feelings that your wife has do you seek to be excused as a juror in this case?

A. If it is possible, yes.

\* \* \* \* \* \*

MR. WERB: Your Honor, it would be defense counsel's position that based on the candor of the remarks of Mr. Bloodsworth that there is some serious concern with his ability to continue as a juror in this case. He has recited to the Court the concern, frustration and emotional upset his wife has experienced as a result of reading the contents of the article and in addition has expressed concern over the possibility of receiving crank phone calls, et cetera.

When questioned about whether or not he desired to continue in his capacity as a juror in this case he appeared without reluctance to indicate that if he could be excused that would be his desire and my concern with his tendered service as a juror in this case would lead one to the result that he could potentially be influenced or swayed by public opinion and sentiment as well as the feelings of his wife.

Two, there could be a possibility of a quick verdict or acting quickly to arrive at a verdict in this case so as to get this matter over and done with. I think in light of his responses it would be appropriate to have him excused from further service in this case.

MR. WHARTON: Your Honor, we really have no position with respect to his request. However, if the Court is inclined to excuse him I would suggest that the Court—I guess if he is excused he would be leaving. I don't know if he has any belongings to collect but if he has to return to the jury room he should be

The decision was appealed by the *News Journal* to the Supreme Court of Delaware, which affirmed the decision to keep the jurors' names confidential. *Gannett Co., Inc. v. State*, Del.Supr., 571 A.2d 735.[4]

The trial has now concluded. The defendant was found guilty of two counts of first degree murder, for which he was sentenced to two consecutive life terms. The jury could not reach a decision on the third count of first degree murder. The convictions have been appealed and the State is continuing its investigation on the third count, as well as other disappearances potentially linked to this defendant.

■ The *News Journal* now moves this Court to vacate the July 28, 1989 order and release the jurors' names. The *Journal* argues that the defendant's right to a fair trial is no longer implicated because the trial has ended; that the jurors' have no post-verdict privacy rights; and that the *Journal* has a right of access to the list of names.

This Court previously concluded that the media's right of access is identical in scope to the rights of the general public. *State v. Pennell, supra* at 4. In that decision, the Court concluded that under the common law, which is codified as Delaware's Freedom of Information Act (FOIA),[5] and the statutory right of discretion to keep jurors' names confidential,[6] the records are not public records to which the public has access once the Court determines that the names should be confidential.

Because the media's right of access is no greater than the public's right of access, the names shall not be disclosed if "the Court determines that any or all of this should be kept confidential or its use limited in whole or in part...." 10 *Del.C.*

§ 4513(a). *See, United States v. Gurney*, 5th Cir., 558 F.2d 1202 (1977) *reh'g denied*, 562 F.2d 1257 (1977), *cert. denied sub nom. Miami Herald Pub. Co. v. Krentzman*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978) (denying access to the names and addresses of jurors because the documents were not part of the public record).

Except for the decisions dealing with this specific case, there is no case law interpreting 10 *Del.C.* § 4513 and there is little legislative history. However, in enacting the Chapter on Jury Selection and Service, which includes that provision, the State legislature patterned the Delaware statutes after the Federal Jury Selection and Service Act, 28 *U.S.C.* § 1861 *et seq. State v. Robinson*, Del.Super., 417 A.2d 953, 956, n. 1 (1980).

The Federal statute provides that in devising a written plan for selection of jurors the plan shall:

> ... fix the time when the names drawn from the qualified jury wheel shall be disclosed to the public. *If the plan permits these names to be made public*, it may nevertheless permit the chief judge of the district court, or such other district court judge as the plan may provide, to keep these names confidential in any case where the interests of justice so require.

28 *U.S.C.A.* § 1863(b)(7) (West Supp.1989) (emphasis added).

Similarly, the Delaware statute permits confidentiality at the Court's discretion and the Superior Court Jury Plan § 16 provides that the names may be kept confidential if it is "in the interest of justice."

In requiring District Courts to adopt a plan with certain requirements, the Con-

admonished not to discuss his concerns with anyone else.
(Juror No. 11 entered chambers.)
  THE COURT: Have a seat, Mr. Bloodsworth.
  JUROR NO. 11: Okay.
  THE COURT: Do you have any belongings with you in the jury room today:
  JUROR NO. 11: An umbrella.
  THE COURT: All right. I am going to excuse you from further jury service in this case. I am going to admonish you not to

discuss our conversations with any fellow jurors. You may go to the jury room, retrieve your umbrella and then leave the courthouse.

4. The Delaware Supreme Court opinion concluded that no qualified First Amendment right of access exists in this case. *Gannett, supra,* 571 A.2d at 744.

5. 29 *Del.C.* §§ 10001–10005.

6. 10 *Del.C.* § 4513.

gress acted deliberately to provide the Courts with discretion. It said, "the plan approach is designed to provide a significant measure of flexibility so that localities may adjust the administration of jury selection to their particular needs." H.Rep. No. 1076, 90th Cong., 2d Sess., *reprinted in* 1968 *U.S.Code Cong. & Admin.News* 1792, 1799 (hereinafter H.R. No. 1076). Likewise, the Delaware statutes on jury selection and service, which require a similar plan, were enacted to improve court efficiency. *See,* S.B. 46, 134th Gen. Assembly, Synopsis (Jan. 28, 1987) (amended and adopted without changing this provision, Feb. 17, 1987).

Specifically regarding the federal provision on release of jurors' names, the Congress said that the section allows each district to provide for disclosure of names, permitting the present diversity of practice to be continued. H.R. 1076 at 1801. It recognized that some courts keep jurors names confidential and other courts routinely publicize the names. *Id.*

Besides recognizing and allowing courts continued use of discretion in publicizing jurors' names, the Congress also recognized the administrative burden of preparing juror lists and noted that disclosure was not permitted routinely. H.R. No. 100–889, 66, 100th Cong., 2d Sess., *reprinted in* 1988 *U.S.Code Cong. & Admin.News* 5982, 6026 [7] (hereinafter H.R. No. 100–889).

The Federal statute has now codified the common law practice of allowing Courts to determine if a list is required and provides that the list will not be disclosed except pursuant to the jury plan or for challenging compliance with selection procedures or after the master jury wheel is emptied and refilled. 28 *U.S.C.A.* § 1864(a). Similarly, the Delaware statutes and jury. plan leave disclosure decisions to the Court and do not permit disclosure of records except in accordance with the jury plan or as needed to

challenge compliance. 10 *Del.C.* § 4513(a) and (b).

In using its discretion to keep the names confidential, the Court cannot make its decision arbitrarily. *United States v. Tucker,* C.A. Ga., 526 F.2d 279 (1976) *cert. den.,* 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976); *United States v. Stokes,* C.A. Ga., 506 F.2d 771 (1975) (although both of these cases related to situations where the defendant was entitled to access to the jury list, they noted that the standard of review for 28 *U.S.C.* § 1863(b)(7) was whether the decision to withhold the names was arbitrary). Similarly, such discretionary decisions in Delaware cannot be arbitrary, without proper consideration of the facts and the law pertaining to the matter. Here, the law states that the jurors' names may be kept confidential if the Court so determines, 10 *Del.C.* § 4513(a), and if it is in the interest of justice. Super.Ct. Jury Plan § 16. Neither the Code nor the jury plan establish a particular time for the names to be released. This is consistent with the Federal law which recognizes that the time frame should be determined by the Court. It also is consistent with preventing an arbitrary decision because it allows the Court to consider the pertinent facts of each case to determine when or if the names should be released.

In this case, although the trial has concluded, the Court considers some of the same law and factors considered in its previous opinion. Even if the defendant's right to a fair trial is no longer implicated, the Court must recognize that jurors, who are members of the public, have privacy concerns that the Court will weigh. *State v. Pennell, supra* at 30.

It is important that the public knows that their privacy may be respected so that they will readily participate when they are subpoenaed by the Court to fulfill their obligation. The public does not seek this duty; the Court demands it

---

7. In amending 28 *U.S.C.* 1864(a) to exclude the requirement that the clerk or jury commission prepare an alphabetical juror list from the master jury wheel, the Congress said, "Many Courts report that no apparent good is served by the mandatory preparation of this list, in that it is

rarely referred to and in fact is not permitted to be routinely disclosed. Furthermore, the preparation of this list is extremely burdensome, especially in those automated courts in which the master wheel itself is not alphabetized." H.R. No. 100–889 at 6026.

subject to contempt of court proceedings. . . .

*Id.*

This duty and service of the highest obligation of citizenship should be an interesting and rewarding experience to be looked back on with interest and pleasant recollection by those who are privileged to be selected. *United States v. Thomas,* 2d Cir., 757 F.2d 1359, 1365, n. 1 (1985) (affirming decision to empanel anonymous jury).

The mere fact that a trial has ended does not mean that the criminal justice system should disregard any rights of these members of the public. If these rights are disregarded, the justice system can only add to the difficulties already experienced in getting prospective jurors to participate in the system, especially in a trial that is lurid and highly publicized.[8]

■ The *News Journal* states in its motion that jurors have no post-verdict privacy rights. This Court absolutely rejects this arrogant conclusion. First, the Delaware statute and the Superior Court Jury Plan establish no time frame in which the Court must release the names. Second, the history of jury *voir dire* in Delaware has been that while the jurors' names have been routinely announced, their privacy has been respected by having their answers to publicly asked questions taken at side bar, often with no record preserved of their answers. The historical fact is that in capital cases, many times some or all of the individual *voir dire* has been conducted in a jury room, *in camera. State v. Pennell, supra* at 18, n. 6. Thus, Delaware has routinely recognized a juror's right to privacy as to personal information of a sensitive nature. Third, the legislative history of the Federal statute, which is similar to Delaware's, recognized that localities must have a significant measure of flexibility to adjust procedures to their particular needs. H.R. No. 1076, *supra* at 1799. By enacting

legislation patterned after that statute, the State legislature created a similar measure of flexibility for this Court. Fourth, the United States Supreme Court has expressly recognized such rights in *Press–Enterprise Co. v. Super.Ct. of Ca.,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (hereinafter, *Press–Enterprise I*).

The *News Journal* cites one federal district court's opinion that "the court cannot assert a juror's privacy post-verdict." *United States v. Franklin,* N.D.Ind., 546 F.Supp. 1133, 1144 (1982). In *Franklin,* the defendant was charged with violating the civil rights of another man by attempting to shoot him. The trial involved some unique security problems to the court, its personnel, witnesses and the defendant himself. There was much national and local media attention. After a verdict of not guilty was returned, the Court advised the jury it had enjoined the participants and "all others" from attempting to interrogate the jurors about their deliberations or the reason for their verdict.

The media filed a motion to vacate the order and a writ of mandamus. While modifying the order to exclude the provision that enjoined "all others" from interrogating the jury about its deliberations, the Court said that the trial court "has the power to bring post-verdict interrogation of jurors under his control." *Franklin* at 1139 (citing *Miller v. United States,* 2d Cir., 403 F.2d 77 (1968)). While recognizing that it is "a general proposition [that] the Court cannot assert a juror's privacy post-verdict," *Franklin* at 1144, the Court, in its modified order provided that, "It shall be and remains the exclusive private decision of the members of this jury panel as to whether or not they desire to be interviewed regarding this trial by members of the press and the public." *Id.* at 1145.

In rendering its decision, the Court said that a major premise for its decision was

---

8. Delaware, which has a small population base from which to draw jurors, is already experiencing difficulty in getting members of the community to participate. For example, in the *Pennell* case, more than 600 people were subpoenaed and less than 150 people reported. Of these,

106 prospective jurors were subjected to individual *voir dire* before a jury of twelve with six alternates could be empaneled. The Prothonotary's Office stated that this percentage of participation was not uncommon.

that the defendant was acquitted. It said that whether the reasoning or result would apply to a criminal case where there was a conviction was reserved for another time. *Id.* at 1138.

In addition to the fact that the Court did not address the issue of what would occur if there had not been an acquittal, the Court based its decision solely on the impact such interrogation would have on jury deliberations and the authority of the Court to prevent post-verdict interrogation. It did not attempt to assert the jurors' right of privacy post-verdict. In fact, it said it "had absolutely no intention of attempting to do so." *Id.* at 1144.

Since *Franklin,* a similar order was imposed on the media and the public. *United States v. Harrelson,* 5th Cir., 713 F.2d 1114 (1983) *cert. den. sub nom. El Paso Times, Inc. v. United States Dist. Ct. for the Western Dist. of Texas,* 465 U.S. 1041, 104 S.Ct. 1318, 79 L.Ed.2d 714 (1984). In *Harrelson,* the Court ordered that all persons were prohibited from approaching, questioning or interviewing any juror, or his relatives, friends or associates, concerning the jury's deliberations, except with leave of the court granted upon good cause shown. The court found that the jurors, even after completing their duty, are entitled to privacy and protection against harassment. *Id.* at 1118. The Appeals Court said that the trial court judge had not abused his discretion by ordering that "no person could make repeated requests for interviews or questioning after a juror has expressed a desire not be interviewed." It said that "common sense tells us that a juror who has once indicated a desire to be let alone and to put the matter of his jury service behind him by declining to be interviewed regarding it is unlikely to change his mind; and if he does, he is always free to initiate an interview." *Id.* The Circuit Court rationale is far more persuasive than that of the District Court Judge in *Franklin.*

Here, the jurors during *voir dire* were asked if having their names published by the press would preclude their ability to be fair. At that time, some of the jurors indicated that they did object to the publication of their names, but that they could be impartial. At the conclusion of the lengthy trial, the jurors, having been exposed to the constant attendance of the media, unanimously told this Court that they did not wish the press to have access to their names.[9] The *News Journal* also reported that when the jurors were released and escorted outside that the jurors declined to comment on the case. One alternate juror did speak, but declined to give his name.[10] The Court notes the jurors' response to its inquiry and to the media's questions after the verdict as indicating that the jurors do not wish to be interviewed.

While understanding the jurors' request for privacy, the Court must also consider the right of access of the press. It is well established that the press has no greater right than the public. The press and all others are free to report whatever takes place in the courtroom, but the particulars of jury deliberation are not available to the public or the press. *Harrelson* at 1118. *See also, Gurney, supra* at 1210–11. The reason for not making deliberations public is that, "Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Harrelson, supra* (citing *Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 468, 77 L.Ed. 993 (1933)).

In addition to the above concerns, the Court must also consider other impacts on the jurors' privacy that such release might have.

In the *Pennell* trial, the Court deviated from its routine procedure in capital cases and rather than announcing the names and then proceeding with some or all of the individual *voir dire in camera,* it withheld

---

**9.** As noted in the Affidavit of the Chief Bailiff of the Superior Court, a Court's exhibit in this case.

**10.** *News Journal,* Nov. 29, 1989.

solely the names and juror questionnaires (with personal data) and allowed a completely open *voir dire.* In so doing, the jurors were asked personal questions ranging from educational background to positions on the death penalty. The press was free to print these answers. Some of the answers, if coupled with the names, could cause the jurors pain and embarrassment. For example, one juror was in a wheel chair and the Court had to inquire into his medical condition and how it might affect his ability to sit for long periods of time;[11] one juror testified that his brother was accused of burglary and his case was pending in another state; another juror testified that his brother had been picked up for drunken driving.

These are personal matters about which the Court was required to inquire; and, that the jurors were required to answer, in order to provide the parties an opportunity to find a group of unbiased citizens to serve as jurors.

The United States Supreme Court has held that even when the Court determines that *voir dire* should be closed, it can satisfy the constitutional requirements of access to proceedings while safeguarding the juror's valid privacy interests, interests that the *Journal* argues do not exist. *Press–Enterprise I* at 512, 104 S.Ct. at 825. In that opinion, the Court noted that one means to achieve this balance of rights would be to withhold a juror's name to protect the person from embarrassment. *Id.* at 513, 104 S.Ct. at 825.

Further, while the *New Journal* argues that because the case has ended, the defendant's rights are no longer implicated, there is authority which indicates that the status of the case should be weighed in determining if information should be released. *Nixon v. Warner Communications,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). In *Nixon,* the Court upheld a decision precluding release of certain tapes to the media, holding that the common law right of access is one best left

to the sound discretion of the trial court, to be exercised in light of the relevant facts and circumstances. It noted that the lower court had as a principal reason for refusing to release the tapes, fairness to the defendants, who were appealing their convictions. 435 U.S. at 602, n. 14, 98 S.Ct. at 1314, n. 14, 55 L.Ed.2d at 582, n. 14. In that case, the appeals were resolved before the Supreme Court made its decision. Here, the appeal is pending. Also, in this case, the jury did not acquit the defendant on one count of first degree murder; it could not reach a decision. The investigation into that count is continuing. Likewise, other charges may be initiated against this defendant. *See, United States v. Doherty,* 675 F.Supp. 719, 724 (1987) (Sixth Amendment rights of the defendant are still vitally implicated).

The Court must also consider the potential for harassment that the jurors may experience if the names are released. *See, State v. Pennell, supra,* and cases cited therein; *Press–Enterprise I, supra; Harrelson* at 1118 (jurors, even after completing their duty, are entitled to privacy and to protection against harassment) (citing *In re Express–News Corp.,* 695 F.2d at 810); *Franklin* at 1139 (jurors ought not be subject to harassment) (citing *United States v. Crosby,* 2d Cir., 294 F.2d 928, 950 (1961), *cert. denied sub nom. Mittleman v. United States,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). On December 27, 1989, this Court held an evidentiary hearing on this motion. At that hearing a series of newspaper articles about the *Pennell* trial were entered as exhibits by the Court. Those reports show that the *Journal* referred to one juror in the case as looking "more like a mad killer than Pennell;" that a boyfriend of a woman whose disappearance had been linked to Pennell although he was not indicted on that count, had threatened that he had a gun and would come to the Courthouse; that the *Journal* had interviewed jurors whose names were released in another capital murder case oc-

---

**11.** In reporting on this, the *News Journal* reported that no explanation was given for why he

was in a wheelchair.

curring at approximately the same time; [12] and that one juror in that case had received several phone calls, on the day the verdict was returned, from friends astonished by the verdict. The attorney for Mr. Pennell testified that he had received threatening phone calls during the trial.

Other articles, not included at that hearing, reflect that friends and families of the victim whom Pennell was not convicted of killing are unhappy with the verdict. In one particular instance a family member of one victim whom Pennell was not charged with killing ran his own investigation of the crime, attended the court sessions everyday and had taken the victim's son to the prison, courthouse, and other pertinent sites. That relative has expressed dissatisfaction with the jury's verdict, being quoted as saying, "I know he's guilty. I don't need 12 people up there going over things to let me know. He's guilty for five, not two." *News Journal*, "Killer's victims leave legacy of grief and anger", Nov. 29, 1989.

This Court has previously concluded that this case is not a First Amendment freedom of access case because the order is merely an administrative order, directing the acts of its own personnel pursuant to statutory authority. Further, it is not a prior restraint order prohibiting the publication of anything. *Gannett Co., Inc. v. State, supra; State v. Pennell, supra; Gurney, supra.* The withholding of jurors' names is not a form of closure of proceedings, as the *News Journal* argues.

The United States Supreme Court in *Press–Enterprise I, supra,* at 464 U.S. at 512, 104 S.Ct. at 825 specifically noted that in an appropriate case jurors' names could be withheld "to protect the person from embarrassment." The Chief Justice speaking for the Court questioned why the trial court did not "consider whether he could disclose the substance of the sensitive answers while preserving the anonymity of the jurors involved." *Id.* at 513, 104 S.Ct. at 825. Finally, as Justice Marshall noted in his concurring opinion:

In those cases where a closure order is imposed, the constitutionally preferable method for reconciling the First Amendment interests of the public and the press with the legitimate privacy interests of jurors and the interests of defendants in fair trials is to redact transcripts in such a way as to preserve the anonymity of jurors while disclosing the substance of their responses.

*Press–Enterprise, supra,* 464 U.S. at 521, 104 S.Ct. at 829.

Thus, the test in *Press–Enterprise I* is that, "Where the State attempts to deny the right of access in order to inhibit disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest."

Assuming that the *Press–Enterprise* standard would apply, the interests sought to be protected here have already been set forth. The State has an interest in protecting juror privacy, even after the trial—to encourage juror honesty in the future—that is co-extensive with the jurors' own privacy interests. *Press–Enterprise I, supra* at 517, 104 S.Ct. at 827 (Blackmun, J. concurring). This State's interests, which concern the protection of juror deliberations and the possibility of harassment or embarrassment have been discussed above. Likewise, the Court has a compelling interest in preserving a jury system where jurors will willingly serve.

The Court also seeks to protect the rights that the defendant still has, which include not only his rights on appeal, but the protection of his rights in any subsequent trial. *Press–Enterprise I, supra; United States v. Doherty,* 675 F.Supp. 719, 724 (1987) (even though the trial of the specific individuals accused is over, the underpinnings of the jury system and the Sixth Amendment rights of the defendants—especially of the defendant who was acquitted—are still vitally implicated).

The pre-trial order in this case had been narrowly tailored to protect these interests. More restrictive means were considered by the Court and rejected. The Court could

---

**12.** The article indicates that the press talked to one juror at least twice on the same day. It does not indicate who initiated the interview either time.

have issued an order similar to those cited above that absolutely preclude any persons from interviewing the jurors, their relatives, friends and associates post-verdict and subject them to penalties if they attempt to do so. *See, Harrelson, supra; see also*, Annotation, *Validity and Effect of Restraints on Postverdict Communication Between News Media and Jurors in Federal Case*, 93 A.L.R. 415 (1989).

The *Journal* has indicated that it is concerned that bias of jurors will not be reported if the names are not published. By allowing a completely open *voir dire*, which the press and the public attended daily, and by not prohibiting the media from photographing the jurors, the public and the press had the opportunity to observe the jurors and report on any biases uncovered. The media has advanced no other reason for wishing to publish the names; in fact, at oral argument it was suggested that the names might not even be published. It is curious to note that the role of the press in assuring a defendant an unbiased jury by publishing jurors' names and, thus, involving the public at large in jury selection attaches only in sensational murder trials. In all other criminal trials apparently such publication of jurors' names is unnecessary to assure unbiased jurors.

■ This Court concludes that it has the power in appropriate cases to withhold jurors' names post-verdict. For example, in a case where community reaction to the verdict is at a fever pitch; or, where com-

munity tensions are at an extremely high level, the release of jurors' names could prevent the jurors' return to their communities without severe harassment.[13] In that case, the Court must be able to act to protect the jurors, and therefore, the jury system. Where the jury has actually been threatened as well as in many organized crime cases, the post-trial release of jurors' names could be physically dangerous to them. The Court again must be free to act to protect those jurors and the jury system.

In this case, despite the sensational publicity, the Court finds that a less restrictive act than continued confidentiality can protect the jurors' legitimate privacy interests. In this case, it is unlikely that the community will seek to harass or harm the jurors at this time. Likewise, the jurors' answers to *voir dire* questions including many of an extremely personal nature were made while identified by number. The jurors' names alone do not provide a connection to those sensitive or embarrassing answers. An alphabetical listing of the names of the eighteen jurors and alternates will be placed in the file in the Prothonotary's Office. The juror qualification forms and all records relating to the numbers assigned to individual jurors will not be disclosed.

IT IS SO ORDERED.

---

13. In such cases it is possible that fear of such results and the knowledge that their names would be disclosed could impact on the jurors' ability to deliberate fairly. As noted in *Gannett, supra*, 571 A.2d at p. 756, n. 3, Justice Walsh's dissent:

The names of jurors were public at William Penn's trial in 1670 for inciting an unlawful assembly. For a summary of Penn's account of the trial, *see* W. Forsyth, *A History of Trial by Jury* 337–44 (2d ed. 1878). The jury persisted in finding Penn guilty of no crime, despite the judge's insistence that Penn was guilty. "'Here some of the jury seemed to buckle to the questions of the court; upon which Bushel, Hammond, and some others, opposed assembly in their verdict....'" *Id.* at 340. Finally, "[t]he court ... commanded that every juror should distinctly answer to his name, and give in his separate verdict, which they unanimously did, saying, Not

guilty 'to the great satisfaction of the assembly.'" *Id.* at 343.

In the William Penn trial, the publication of the jurors' names was ordered by the Court in an individual polling of their verdict in an *attempt* to coerce a "guilty verdict"—the very type of jury pressure that the American system of justice seeks to prevent.

"The notions of a jury of one's peers and of an impartial jury also developed during this period, but as exemplified in William Penn's trial, they were not quite what we consider today." V. Hans and N. Vidmar, *Judging the Jury* 29 (Plenum, 1986).

In fact, at the time of the William Penn trial, jurors were usually selected by the Sheriff because of their bias toward the Crown. *Id.* at 29. Thus, while publication of jurors' names as a coercive force was recognized by English Common law, it has no place in the American jury system.