[No. D011794. Fourth Dist., Div. One. Feb. 26, 1991.]

COPLEY PRESS, INC. Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Harold W. Fuson, Jr., Judith L. Fanshaw, Gray, Cary, Ames & Frye, Marilyn L. Huff and John Allcock for Petitioner.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Lewis P. Zollinger, Deputy County Counsel, for Respondent.

Edwin L. Miller, Jr., District Attorney, Thomas F. McArdle and James E. Atkins, Deputy District Attorneys, Fletcher & Patton and William R. Fletcher for Real Party in Interest.

## OPINION

**TODD, J.**—This matter, first decided by this court on September 11, 1990, is again before us pursuant to a remand for further consideration from our Supreme Court. The Supreme Court directed us to vacate our original opinion (223 Cal.App.3d 994) and consider the matter anew in light of *Lesher Communications, Inc.* v. *Superior Court* (1990) 224 Cal.App.3d 774 [274 Cal.Rptr. 154]. Accordingly, on December 19, 1990, we ordered our first decision vacated and asked the parties to brief how *Lesher* affects this proceedings.

All of the parties agree that *Lesher* differs from our original opinion in that *Lesher* holds the public or press does *not* have access to jury questionnaires filled out by venirepersons who are not called to the jury box for oral voir dire. We agree this is a valid distinction between the two opinions, and we shall adopt the *Lesher* holding. Further, we conclude this is the only valid distinction in the holdings of the two cases, a conclusion apparently shared by the panel in *Lesher*, which voiced its agreement with our earlier opinion "with but one exception"—namely the confidentiality of questionnaires filled out by venirepersons who are not called to the jury box. (*Lesher, supra,* 224 Cal.App.3d at p. 779.)

However, two of the parties—Copley Press, Inc. and the superior court—contend there is another distinction concerning whether questions included in the jury questionnaire dealing with juror qualification are confidential. We disagree. It is apparent that the questionnaires involved in the two cases are different, with the questionnaire here containing 219 questions while the one in *Lesher* contained 120. Nothing in *Lesher* indicates the questions contained in that questionnaire included the type of confidential information (e.g., telephone number, Social Security number, driver's license number) that is essential for the determination of juror qualification and management of the jury system as was the case here.[1] Indeed, the inference we

---

[1] The single paragraph dealing with this issue in *Lesher, supra,* 224 Cal.App.3d at page 779, reads as follows: "Finally, we reject respondent court's contention that certain information contained in the questionnaire is designed to determine juror qualification and should remain confidential pursuant to *Pantos* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 258 [198 Cal.Rptr. 489]. Presumably, the jurors have already submitted such information, been deemed qualified, added to the master jury rolls, and now been called to service.

draw from the single paragraph devoted to the issue in *Lesher*, is in that case such information already had been gathered before the venirepersons were asked to fill out the 120-question questionnaire. Accordingly, we stand by our original view, expressed in part III of the opinion, *infra*, that certain information, (e.g., telephone number, Social Security number, driver's license number) that is essential for the determination of juror qualification and management of the jury system, but is not properly part of the voir dire, should be kept confidential.

In light of the distinction made in *Lesher* and the Supreme Court's remand of the case, we reissue our original opinion as modified below:

The Copley Press, Inc. (Copley), publisher of the San Diego Union and The Tribune, has petitioned for a peremptory writ of mandate by which it seeks access to confidential voir dire questionnaires used in a capital case. As will be seen, the press is constitutionally entitled to have access to such questionnaires. However, because of particular circumstances involved in this case, our holding shall have prospective application only.

FACTS

This case stems from the criminal trial of Roberta D. Pearce, who was charged with the murder of her husband and the special circumstances that the murder was done for financial gain (Pen. Code, § 190.2, subd. (a)(1)) and the murder was committed while lying in wait (Pen. Code, § 190.2, subd. (a)(15)). During the voir dire of this capital case, a reporter for the San Diego Union who was attending the proceedings submitted a written request to the trial court for access to questionnaires filled out by venirepersons. The trial court did not release the questionnaires.

In accordance with established court procedures authorized by Code of Civil Procedure section 205 and division VIII, section Four, rule 4.1, of the San Diego Superior Court Rules, a detailed questionnaire had been distributed to 300 prospective jurors. Because the case involved the death penalty, the trial court had instructed the jury commissioner to include questions by the trial attorneys to facilitate the voir dire process. The questionnaire contained 219 questions.[2] An instruction sheet for the questionnaire informed the prospective jurors of the following:

---

Examination of the 120 questions included in the subject questionnaire leads to but one conclusion concerning their purpose: to select a fair and impartial jury in *this* case, People v. Sapp." (Original italics.)

[2] The bulk of the questions were not of a confidential type; however, a number of them elicited information that to some people would be of a confidential nature. For example, venirepersons were asked if they had been the victims of child molestation or other forms of child

"[T]he information contained in this questionnaire will become part of the court's permanent record. However, it will not be distributed to anyone except [the trial court], [the court's] staff and the attorneys in the case while it is pending." After the prospective jurors filled out their questionnaires, they were called by appointment for individual voir dire, which was held in the courtroom and was open to the public. Approximately one-half of the prospective jurors were excused for hardship or other cause. At the point when there were 80 venirepersons who had not been excused for cause, the trial court divided them into two groups of forty and told each group to report at a specific time. At these times, the attorneys were afforded the opportunity to exercise their peremptory challenges. The peremptory challenges for all prospective jurors were exercised within two and one-half to three hours. The entire voir dire examination took 18 days, including 1 day for the venirepersons to fill out the questionnaires.

On January 25, 1990, counsel for Copley filed a motion, which in essence requested the trial court to release the questionnaires. On February 22, 1990, the trial court heard argument on Copley's motion. The request was denied. On March 12, 1990, Pearce was found guilty. On March 14, 1990, Copley filed this petition.

DISCUSSION

I

 In hearing this writ and fashioning the remedy that we propose, we are cognizant that not only voir dire but the entire trial has been completed.[3] Regardless of that fact, the issues this case raises are " 'capable of repetition, yet evading review.' " (*Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 546 [49 L.Ed.2d 683, 690, 96 S.Ct. 2791], quoting *Southern Pacific Terminal Co.* v. *ICC* (1911) 219 U.S. 498, 515 [55 L.Ed. 310, 316, 31 S.Ct. 279].) It is reasonable to assume that Copley, as publisher of two newspapers in San Diego County, would be denied access to confidential questionnaires in another capital trial held in the county.[4] And it is possible—as happened in this case—review of the issue will be put off for more than a month, in which time voir dire would be completed and possibly the trial as well. Thus, it is in the public interest that we proceed with this writ proceeding (*Kirstowsky* v. *Superior Court* (1956) 143 Cal.App.2d 745, 749

---

abuse and if they or their relatives had sought counseling, or have had a chemical dependency.

[3] Copley, nonetheless, continues to seek release of all the questionnaires.

[4] We take judicial notice of *Copley Press, Inc.* v. *Superior Court* (Sept. 15, 1988) D008333, another capital case in which Copley sought similar relief. That petition was denied because voir dire was never completed and we concluded the issues presented were moot.

[300 P.2d 163]; see also *DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54 [13 Cal.Rptr. 663, 362 P.2d 487]) and produce what, as will be seen, is an opinion with prospective application only.[5]

## II

As respondent superior court concedes, the United States Supreme Court in *Press-Enterprise Co.* v. *Superior Court of Cal.* (1984) 464 U.S. 501 [78 L.Ed.2d 629, 104 S.Ct. 819] (*Press-Enterprise*) established that the First Amendment to the United States Constitution affords a right of access to the voir dire examination of the jury in a criminal trial.

*Press-Enterprise, supra,* 464 U.S. 501, involved the capital trial of a man charged with rape and murder of a teenage girl. Before voir dire examination of prospective jurors began, the Press-Enterprise newspaper moved that voir dire be open. The trial court allowed the newspaper to attend only the general voir dire, closing the individual voir dire of venirepersons. The entire voir dire took six weeks, with three days open to the public. After the jury was impaneled, the newspaper asked the trial court to release complete transcripts of the voir dire proceeding. The trial court refused. After the defendant was convicted and sentenced to death, the newspaper renewed its request. It again was denied. The Court of Appeal denied the newspaper's petition for writ of mandate. The United States Supreme Court reversed, vacating the order denying relief.

---

[5] We observe that on June 5, 1990, the voters enacted Proposition 115, which repeals section 223 of the Code of Civil Procedure and replaces it with a new section 223 to the Code of Civil Procedure. The new section provides: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause. [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

We note that if this portion of Proposition 115 is ultimately upheld by the California Supreme Court, the nature of voir dire will be changed drastically with the elimination of the use of voir dire to assist in the exercise of peremptory challenges. Many of the questions on the questionnaire used in this case, e.g., "What was the last grade you attended in school?" and "Do you belong to any group or organization active in political matters . . . ?," would no longer be allowed in the typical criminal case. (On December 24, 1990, the Supreme Court, with but one exception, not relevant here, rejected a two-prong attack on Proposition 115, challenging the measure on the grounds it violated (1) the "single subject" rule embodied in article II, section 8, subdivision (d) of the state Constitution and (2) the rule requiring constitutional "revisions" to be accomplished by more formal procedures than are contemplated for mere constitutional "amendments" (see Cal. Const., art. XVIII). (*Raven* v. *Deukmejian* (1990) 52 Cal.3d 336 [276 Cal.Rptr. 326, 801 P.2d 1077].))

The Supreme Court traced the history of jury selection and noted "since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." (*Press-Enterprise, supra,* 464 U.S. at p. 505 [78 L.Ed.2d at p. 635].) The Supreme Court also discussed the value of having open proceedings:

". . . No right ranks higher than the right of the accused to a fair trial. But the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the *voir dire* which promotes fairness.

"The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system. [Citation.]" (464 U.S. at p. 508 [78 L.Ed.2d at p. 637].)

■ However, the right of access—be it to voir dire or other portions of the trial—is not absolute. "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." (*Press-Enterprise, supra,* 464 U.S. 501, 510 [78 L.Ed.2d 629, 638]; see also *Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596, 606-607 [73 L.Ed.2d 248, 256-258, 102 S.Ct. 2613].)[6]

■ Here, the respondent superior court argues maintaining the confidentiality of the questionnaires supports three overriding interests: (1) administering an expeditious trial; (2) preserving the defendants's right to a fair and impartial jury trial; and (3) protecting the juror's right to privacy.

While efficient judicial administration is a praiseworthy purpose and one we applaud, it does not reach constitutional dimensions. As much as we would like to see judicial proceedings run efficiently and expeditiously, we

---

[6] In determining whether to impose limitations on access to a trial, " '[T]he question in a particular case is whether the control is exerted so as not to deny or unwarrantedly abridge . . . the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.' " (*Richmond Newspapers, Inc.* v. *Virginia* (1980) 448 U.S. 555, 582, fn. 18 [65 L.Ed.2d 973, 992, 100 S.Ct. 2814], quoting *Cox* v. *New Hampshire* (1941) 312 U.S. 569, 574 [85 L.Ed. 1049, 1052-1053, 61 S.Ct. 762, 133 A.L.R. 1396].)

cannot give much weight to such a goal when compared to a constitutional interest.

■ With respect to protecting the criminal defendant's right to a fair trial, we agree it is the sort of compelling interest that can override the First Amendment right of access. ■ But there is no showing that in this case these two constitutional interests were in conflict. In *Press-Enterprise, supra*, 464 U.S. 501, the Supreme Court said that when the presumption of openness is overcome by an overriding interest, the trial court must articulate the overriding interest "along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." (*Id.* at p. 510 [78 L.Ed.2d at p. 638].) The trial court made no such findings below.[7] In this writ proceeding, the respondent superior court, in discussing the defendant's right to a fair trial, advances five reasons for preserving the confidentiality of the questionnaires: (1) the questionnaires equalized access for the parties to discovery of prospective jurors' backgrounds; (2) the prospective jurors gave more complete, frank and open information because of the assurances given them that their responses would be confidential; (3) counsel could more intelligently exercise challenges because biases and prejudices of the prospective jurors were more readily detectable through the use of the confidential questionnaires; (4) the questionnaires enabled counsel to be better prepared to examine the prospective jurors; and (5) use of the questionnaires markedly expedited the voir dire procedure. Again, we note the laudable nature of these results, but it is obvious—particularly in the absence of specific facts or findings relevant to this case—the absence of any of them or all of them would not have prevented the defendant from having a fair trial. Furthermore, in addition to making findings, the trial court is required to consider alternatives to closure. (*Press-Enterprise, supra*, 464 U.S. at p. 511 [78 L.Ed.2d at p. 639].) Here, the trial court failed to consider alternatives to maintaining the confidentiality of the questionnaires. "Absent consideration of alternatives to closure, the trial court could not constitutionally close the *voir dire*." (*Ibid.*)

With respect to the jurors' right to privacy, respondent superior court has identified another interest of constitutional dimension. (*Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705]; *Griswold* v. *Connecticut* (1965)

---

[7]The trial court found the questionnaires were not part of the voir dire proceeding, but rather court assistance to the attorneys in obtaining background information concerning the venirepersons. The court also found there was no tradition of press access to such questionnaires, and, therefore, Copley's request did not come under *Press-Enterprise, supra*. In this writ proceeding, respondent superior court continues to maintain the questionnaires were part of the discovery process rather than part of the voir dire proceeding. We shall consider this argument in part IV, *post*.

381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]; Cal. Const., art. I, § 1.) Further, it is clear that here this interest has the potential to be in conflict with the First Amendment right of access to the questionnaires. In *Press-Enterprise, supra*, 464 U.S. 501, 511-512 [78 L.Ed.2d 629. 639], the Supreme Court observed:

"The jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain . . . . The privacy interests of such a prospective juror must be balanced against the historic values we have discussed and the need for openness of the process.

"To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record." (*Press-Enterprise, supra*, 464 U.S. at pp. 511-512 [78 L.Ed.2d at p. 639].)

Thus, *Press-Enterprise, supra*, 464 U.S. 501, teaches that an individualized approach rather than a blanket one is appropriate in considering the privacy rights of prospective jurors. Not only does such an approach preserve the constitutional values of openness, it also enables the trial court to "ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy." (*Id.* at p. 512 [78 L.Ed.2d at p. 640].)

This Supreme Court precedent also instructs that when limited closure is in order, the trial court should strive to restrict access as narrowly as possible so that the salutary nature of openness can be preserved to the largest extent possible. (464 U.S. at pp. 512-513 [78 L.Ed.2d at pp. 640-641].)

We find the suggestions offered in *Press-Enterprise, supra*, 464 U.S. 501, on how to minimize the effects of closure applicable to the use of confidential questionnaires. For example, in *Press-Enterprise*, the Supreme Court suggested:

"When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguard-

ing the juror's valid privacy interests. Even then a valid privacy right may rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment." (464 U.S. at p. 512 [78 L.Ed.2d at p. 640].)

Of course, each case will have its own particular facts regarding the extent to which legitimate privacy rights should be protected. In any event, pursuant to the guidance of the United States Supreme Court, we believe the proper approach is to have the superior court advise the venirepersons that they have the right to request in camera hearings on sensitive questions rather than writing their answers in the questionnaire. Counsel should be present and the session should be reported, with the trial court determining afterward on the record whether a legitimate privacy interest warrants protection. If it does, the trial court should then seal the transcript of the hearing. Henceforth, the superior court shall inform the venirepersons of their right to request in camera hearings to answer specific sensitive questions rather than filling out those answers on the questionnaire form. No explicit or implicit promise of confidentiality should be attached to the information contained in the questionnaires; rather the venirepersons shall be expressly informed the questionnaires are public records. Second, the superior court shall provide access to the questionnaires of individual jurors when the individual juror is called to the jury box for oral voir dire. Public access shall not be provided to questionnaires filled out by venirepersons who are not called to the jury box.[8]

## III

In light of our holding that the public has the right of access to written questionnaires submitted by venirepersons called to the jury box for oral

[8] In *Lesher, supra,* 224 Cal.App.3d at page 779, the court explained: "*Press-Enterprise* does not require that disclosure be made of questionnaires submitted by venirepersons never called to the jury box for voir dire; we assume that these questionnaires play no role whatsoever until a prospective juror is actually called to the jury box. The *Press-Enterprise* court rested its decision that voir dire must be open to the public on the interest of the public in open criminal trials. A review of the history and tradition of open criminal proceedings in English and American courts led to the conclusion that an open trial included an open voir dire. However, venirepersons who are never called to the jury box do not play any part in the voir dire or the trial. They fill out the questionnaire only as a prelude to their participation in voir dire. The questionnaire serves no function in the selection of the jury unless the person filling it out is actually called to be orally questioned. We see no legitimate public interest in disclosure of these questionnaires."

In our original opinion, we had held access should be provided for the questionnaires submitted by venirepersons never called to the jury box because of our concern such questionnaires could be used by counsel in the peremptory challenge process to decide whether to excuse those venirepersons already in the jury box. In balancing this consideration against the jurors' right of privacy, we are now persuaded the *Lesher* rule is the more reasonable.

voir dire, we deem it appropriate to discuss the hybrid nature of the particular questionnaire before us.

Code of Civil Procedure section 205 provides:

"(a) If a jury commissioner requires a person to complete a questionnaire, the questionnaire shall ask only questions related to juror identification, qualification, and ability to serve as a prospective juror.

"(b) Except as ordered by the court, the questionnaire referred to in subdivision (a) shall be used solely for qualifying prospective jurors, and for management of the jury system, and not for assisting in the courtroom voir dire process of selecting trial jurors for specific cases.

"(c) The court may require a prospective juror to complete such additional questionnaires as may be deemed relevant and necessary for assisting in the voir dire process or to ascertain whether a fair cross section of the population is represented as required by law, if such procedures are established by local court rule.

"(d) The trial judge may direct a prospective juror to complete additional questionnaires as proposed by counsel in a particular case to assist the voir dire process."

■ Our inspection of this jury questionnaire leads us to conclude that in this case the 300 prospective jurors were asked to fill out a questionnaire that was designed to determine juror qualification (Code Civ. Proc., § 205, subd. (a)) as well as to assist in the voir dire (Code. Civ. Proc., § 205, subds. (c) and (d)). Thus, because of the hybrid nature of the questionnaire, certain information (e.g., telephone number, Social Security number, driver's license number) is included that is essential for the determination of juror qualification and management of the jury system but is not properly part of voir dire, and public access to it is not warranted. Information of this type should be segregated from the other questions and not released to the public. (See *Pantos* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 258 [198 Cal.Rptr. 489].)

IV

■ Respondent superior court's argument the questionnaires were not part of the voir dire but rather pretrial discovery is not persuasive.

Respondent relies on *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], overruled on other grounds in *People* v. *Boyd*

(1985) 38 Cal.3d 762, 772-773 [215 Cal.Rptr. 1, 700 P.2d 782], which recognized that the prosecution's access to background information about prospective jurors provided an advantage that could only be equalized by allowing the defense access through discovery. The *Murtishaw* court held "a trial judge will have discretionary authority to permit defense access to jury records and reports of investigations available to the prosecution." (*Id.* at p. 767.) *Murtishaw*, therefore, stands for the proposition that the trial court can order the prosecution to share its discovery about the background of venirepersons with the defense. It does not authorize, as the trial court here apparently believed, the court to conduct discovery for the parties. Thus, *Murtishaw* is not on point. The questionnaires were produced and generated by the superior court; therefore, if the questionnaires were part of discovery the court was participating in discovery. The function of the trial court is to adjudicate cases; it is not in the discovery business.

Furthermore, we find telling the following exchange between counsel for Copley and the trial court:

"[Copley counsel]: But the point, I believe, your Honor, is that the voir dire process was not, of course, limited to the oral questions and answers in open court; the voir dire process began with the eliciting of information from the jurors.

"The Court: That's correct. What occurred is that the attorneys and the court collaborated together on what you might call an inquiry or investigation of the jury panel."

It is clear that when the court distributed the questionnaires to the venirepersons with instructions to fill them out, voir dire had begun. The fact that the questioning of jurors was largely done in written form rather than orally is of no constitutional import.

## V

■ Here, each prospective juror was informed the questionnaire he or she filled out would become part of the court's permanent record. However, another representation was made to these 300 venirepersons, namely that the questionnaires they filled out would "not be distributed to anyone except [the judge], [the judge's] staff, and the attorneys in the case while it is pending."[9]

As indicated above, the blanket denial of access to the questionnaires here was unconstitutional. Nonetheless, we conclude that to not honor the trial

---

[9] Despite the vagueness of this implied assurance of confidentiality, we have no doubt that the venirepersons inferred that the questionnaires they filled out were going to be permanently confidential. In our view, under the circumstances presented here, it does not matter that this representation was more of an implied promise of confidentiality than an explicit one.

court's assurance of confidentiality would be unfair to the venirepersons in this case who presumably relied on that assurance. For one thing, those prospective jurors whose backgrounds include information meriting privacy protection were not afforded the opportunity to bypass the written answer to sensitive questions on the questionnaire by requesting an in camera hearing so they could protect potentially legitimate privacy concerns.

Given the representation made to the venirepersons by the trial court, we believe general principles of estoppel should bar release of the questionnaires used in this case. Accordingly, we shall not order them released.

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court in all future cases in which jury questionnaires are used to (1) segregate juror qualification information from other questions, (2) plainly instruct the venirepersons in the body of the questionnaire that (a) the written responses are not confidential, i.e. the questionnaires are public records, and (b) the venirepersons have a right to request an in camera hearing to discuss their responses to any questions they do not wish to answer in writing, and (3) provide access to the questionnaires in accordance with the views expressed above.

Kremer, P. J., concurred.

**NARES, J.,** Concurring.—Absent excuse, citizens are required to attend jury service for nominal remuneration ($5 per day) and one-way mileage. Compelled by United States Supreme Court precedent, today we order (in future cases) the potential public release of sensitive personal information obtained not by consent, but by compulsion.

The questionnaire seeks highly personal information from each prospective juror. For example, the questionnaire asks, "Have you ever sought any type of counseling for problems in a marriage from someone such as a priest . . . . ?" Another question asks, "Do you believe that the lives of some people are more important than others?" Question 177 states, 'Did or does either of your parents use alcohol or drugs to excess?" and another states, "Were you the victim of child molestation or other forms of child abuse. If yes, how has that affected you in your adult life?"

The majority attempts to safeguard the prospective jurors' privacy rights—rights it acknowledges have constitutional dimensions—by requiring a nonconfidentiality warning be placed in the "body of the questionnaire." Given the potential intrusion into a prospective juror's personal life,

in my view, merely a written warning in the "body" is insufficient. First, the written warning should be placed in the questionnaire's introduction and should be printed in bold type.

Second, in *addition* to the written warning endorsed by the majority, before distributing the questionnaire, the trial court should orally alert the prospective jurors their responses are not confidential and will be accessible by newspapers, radio, television, and all other forms of print or electronic media. The trial court should orally advise prospective jurors that if they believe public disclosure of their answer to particular questions may be embarrassing or otherwise infringe on their privacy rights, they should ask for a hearing in chambers before answering the question(s). The court should further orally instruct prospective jurors that the attorneys and court reporter will be present during any such chambers proceeding, and that their request for confidentiality does not insure the answer will remain confidential.

With this additional safeguard, and compelled by the authorities cited in the majority opinion, I concur.

Respondent's petition for review by the Supreme Court was denied May 23, 1991.