THE STATE EX REL. BEACON JOURNAL PUBLISHING COMPANY, APPELLEE AND CROSS-APPELLANT, *v.* BOND, JUDGE; CIRIGLIANO, JUDGE, APPELLANT AND CROSS-APPELLEE.

[Cite as *State ex rel. Beacon Journal Publishing Co. v. Bond*, 98 Ohio St.3d 146, 2002-Ohio-7117.]

*Public records — Juror names, addresses, and questionnaire responses are not "public records" as contemplated by R.C. 149.43 —Juror questionnaires without responses are "public records" for purposes of R.C. 149.43 — First Amendment qualified right of access extends to juror names, addresses, and questionnaires, thereby creating a presumption of openness that may only be overcome, when.*

(No. 2001-1702 — Submitted September 18, 2002 — Decided December 24, 2002.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Summit County, No. 20329.

————————————

**SYLLABUS OF THE COURT**

1. Juror names, addresses, and questionnaire responses are not "public records" as contemplated by R.C. 149.43. Juror questionnaires without responses, however, constitute "public records" for purposes of that section.

2. The First Amendment qualified right of access extends to juror names, addresses, and questionnaires, thereby creating a presumption of openness that may be overcome only "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." (*Press-Enterprise Co. v. Superior Court* [1984], 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629, followed.)

————————————

**MOYER, C.J.**

I. Facts and Procedural History

**{¶1}** Relator-appellee and cross-appellant, the Beacon Journal Publishing Company ("the Beacon Journal"), publishes a daily newspaper known as the "Akron Beacon Journal." On October 19, 2000, the Beacon Journal submitted an informal request in the Summit County Court of Common Pleas, seeking production of the jury questionnaires and the list of juror names and addresses completed in connection with the criminal prosecution of Denny Ross. The trial court denied the Beacon Journal's request, ordering that such information "be held under seal by the court and filed for record at the close of the proceedings."

**{¶2}** The underlying criminal action against Denny Ross originated in May 1999, during which time Ross was arrested and charged with aggravated murder, murder, rape, kidnapping, tampering with evidence, and abuse of a corpse. The prosecution later alleged two special circumstances—murder during rape and murder during kidnapping—thereby rendering Ross eligible for the death penalty.

**{¶3}** The Ross trial commenced with jury selection in the Summit County Court of Common Pleas, Judge Jane Bond presiding. Pursuant to a motion by Ross and with the agreement of the prosecution, Judge Bond ordered the 290 prospective jurors to complete a questionnaire containing 67 questions that, inter alia, inquired into medical history, criminal record, and religious beliefs. After representing to the jurors that they would be identified only by number and that their responses would not be made public, Judge Bond distributed the questionnaires and provided copies of the responses to both parties. From these questionnaires, the parties conducted oral voir dire and impaneled a 12-member jury.

**{¶4}** During the trial, Phil Trexler, a reporter from the Akron Beacon Journal, made an oral request for production of the juror questionnaires and the list of juror names and addresses. Judge Bond denied the request and sua sponte filed a journal entry to that effect, observing that "the extraordinary level of pretrial publicity

requires the protection of the privacy of the jurors and is necessary to assure [sic] the independence and integrity of the jury and to avoid complete sequestration during the trial." Despite these efforts to preserve jury integrity, Judge Bond later declared a mistrial on account of juror misconduct and discharged the jury from service.[1]

{¶5} The Beacon Journal thereafter filed a petition for writ of mandamus in the Court of Appeals for Summit County, seeking an order directing the trial court to release the juror questionnaires and the list of juror names and addresses pursuant to R.C. 149.43 and the First Amendment to the United States Constitution. The court of appeals, construing the petition for writ of mandamus as a petition for writ of prohibition, granted partial summary judgment in favor of the Beacon Journal. In so holding, the court concluded that (1) the juror questionnaires and the list of juror names and addresses were not "public records" subject to inspection under R.C. 149.43, (2) the Beacon Journal had no constitutional right to the juror names and addresses prior to the close of proceedings, and (3) the First Amendment guaranteed the Beacon Journal a right of public access to the questionnaires absent specific findings that " 'closure is essential to preserve higher values and is narrowly tailored to serve that interest,' " quoting *Press-Enterprise Co. v. Superior Court* (1984), 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629.

{¶6} This cause is now before this court upon an appeal as of right.

## II. Analysis

{¶7} This appeal presents two legal issues: (1) whether juror questionnaires and a list of juror names and addresses are "public records" subject to inspection under R.C. 149.43, and (2) whether such information is subject to inspection under the First

---

1. On January 17, 2001, the Chief Justice of this court granted a motion to disqualify Judge Bond from presiding over the retrial and any post-trial motions of the Ross case, *In re Disqualification of Bond (*2001), 94 Ohio St.3d 1221, 763 N.E.2d 593, and appointed Judge Joseph E. Cirigliano, a visiting judge of the Lorain County Court of Common Pleas, to replace Judge Bond. Judge Cirigliano was named respondent in an amended petition for mandamus.

Amendment to the United States Constitution, Section 11, Article I of the Ohio Constitution, and Section 16, Article I of the Ohio Constitution. This is a case of first impression before this court.

A. Public Records Request

{¶8}   The Beacon Journal asserts that the juror questionnaires and the list of juror names and addresses are "public records" subject to disclosure under R.C. 149.43. As a preliminary matter, we note that the Public Records Act "must be construed liberally in favor of broad access, and any doubt should be resolved in favor of disclosure of public records." *State ex rel. Strothers v. Wertheim* (1997), 80 Ohio St.3d 155, 156, 684 N.E.2d 1239. Further, the government bears the burden of establishing that the requested information is exempt from disclosure. *State ex rel. Natl. Broadcasting Co., Inc. v. Cleveland* (1988), 38 Ohio St.3d 79, 83, 526 N.E.2d 786. Against this backdrop, we review the language of the Public Records Act.

{¶9}   Pursuant to R.C. 149.43(A)(1), "public records" are "records kept by any public office." As there is no dispute that the trial court is a "public office" under R.C. 149.011(A), the sole public records issue is whether the jury list and the juror questionnaires fall within the statutory definition of a "record." R.C. 149.011(G) defines "records" to include "any document * * * created or received by or coming under the jurisdiction of any public office * * *, which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office." To the extent that an item does not serve to document the activities of a public office, it is not a public record and need not be disclosed. *State ex rel. Fant v. Enright* (1993), 66 Ohio St.3d 186, 188, 610 N.E.2d 997.

{¶10}  We recently addressed whether personal information held by a public office falls within the statutory definition of a "record" in *State ex rel. McCleary v. Roberts* (2000), 88 Ohio St.3d 365, 725 N.E.2d 1144. In *McCleary*, the city of Columbus implemented a photo identification program requiring parents of children

who used Columbus pools to provide the Recreation and Parks Department with personal information regarding their children. Holding that such information was not subject to disclosure, we observed that "[s]tanding alone, that information, *i.e.*, names of children, home addresses, names of parents and guardians, and medical information, does nothing to document any aspect of the City's Recreation and Parks Department." Id. at 368, 725 N.E.2d 1144.

**{¶11}** Our reasoning in *McCleary* applies with equal force to the juror questionnaire responses and the list of juror names and addresses. The disclosure of information regarding prospective and impaneled jurors does little to ensure the accountability of government or shed light on the trial court's performance of its statutory duties. As we noted in *McCleary*, disclosure of information about private citizens is not required when such information " 'reveals little or nothing about an agency's own conduct' " and "would do nothing to further the purposes of the Act." 88 Ohio St.3d at 368 and 369, 725 N.E.2d 1144, quoting *United States Dept. of Justice v. Reporters Commt. for Freedom of the Press* (1989), 489 U.S. 749, 780, 109 S.Ct. 1468, 103 L.Ed.2d 774.

**{¶12}** The Beacon Journal nonetheless relies on our holding in *State ex rel. Mothers Against Drunk Drivers v. Gosser* (1985), 20 Ohio St.3d 30, 20 OBR 279, 485 N.E.2d 706, paragraph one of the syllabus, for the proposition that "[a]ny document appertaining to * * * the proceedings of a court, or any record necessary to the execution of the responsibilities of a governmental unit is a 'public record.' " The *Gosser* court noted, however, that if "the requested documents are received by, are under the jurisdiction of, *and are utilized by, the court to render its decision*, then * * * [they] could reasonably be classified as 'public records.' " (Emphasis added.) Id. at 33, 20 OBR 279, 485 N.E.2d 706. Unlike the records at issue in *Gosser*, the trial court in the case sub judice did not use the requested information in rendering its decision, but rather collected the questionnaires for the benefit of litigants in selecting an impartial jury and

maintained the jurors' names and addresses for the administrative purpose of identifying and contacting individual jurors.

{¶13} Because the juror questionnaire responses and the list of juror names and addresses are not "records," it follows that they cannot be "public records" subject to disclosure under R.C. 149.43. Nevertheless, we distinguish between the *responses* to the juror questionnaires and the actual *questions* from which such responses were solicited. Whereas responses to juror questionnaires are completed by individual jurors, the questions that elicit such responses are invariably written or approved by the trial court. As a result, such questions serve to document the activities of a public office and thereby satisfy the statutory definition of a "record" under R.C. 149.011(G). Accordingly, we hold that questionnaires without responses are subject to disclosure under the Public Records Act.

## B. Constitutional Challenge

{¶14} The Beacon Journal additionally asserts that the Free Speech and Free Press Clauses of the First Amendment to the United States Constitution, together with the analogous provision of Section 11, Article I of the Ohio Constitution and the "open courts" provision of Section 16, Article I of the Ohio Constitution, guarantee a right of access to the juror questionnaires and the list of juror names and addresses. As we observed in *Cleveland v. Trzebuckowski* (1999), 85 Ohio St.3d 524, 709 N.E.2d 1148, "[t]he First Amendment is the proper basis for interpretation of Section 11, Article I, Ohio Constitution, the provision that establishes those free speech guarantees in Ohio." Id. at 528, 709 N.E.2d 1148, citing *Eastwood Mall, Inc. v. Slanco* (1994), 68 Ohio St.3d 221, 222-223, 626 N.E.2d 59. Moreover, the "open courts" provision of the Ohio Constitution "creates no greater right of public access to court proceedings than that accorded by the Free Speech and Free Press Clauses of the First Amendment to the United States Constitution." *In re T.R.* (1990), 52 Ohio St.3d 6, 556 N.E.2d 439,

paragraph two of the syllabus. Consequently, we address whether the Beacon Journal has a right of access to the juror questionnaires and the list of juror names and addresses primarily under the First Amendment to the United States Constitution.[2] Because the two issues of the juror questionnaires and the jury list are analytically separate inquiries, we address them in turn.

### 1. The Juror Questionnaires

{¶15} In determining whether juror questionnaires are subject to inspection under the United States Constitution, we are guided by the well-settled principle that the First Amendment guarantees the public and press a coextensive right of access to criminal proceedings that have " 'historically been open to the press and general public' and in which 'public access plays a significant positive role in the functioning of the particular process in question.' " *In re T.R.*, 52 Ohio St.3d at 12, 556 N.E.2d 439, quoting *Press-Enterprise Co. v. Superior Court* (1986), 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 ("*Press-Enterprise II*"). Applying these twin tests of "experience and logic," id. at 9, 106 S.Ct. 2735, 92 L.Ed.2d 1, the United States Supreme Court has held that the presumptive right of access extends to the voir dire examination of prospective jurors. *Press-Enterprise Co. v. Superior Court* (1984), 464 U.S. 501, 508-510, 104 S.Ct. 819, 78 L.Ed.2d 629 ("*Press-Enterprise I*"). In so holding, the court reasoned that "since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." Id. at 505, 104 S.Ct. 819, 78 L.Ed.2d 629.

{¶16} The policy underlying the presumptive right of access to voir dire has endured over centuries of Anglo-American jurisprudence. Indeed, the right of public access "plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact

---

2. The First Amendment to the United States Constitution is applicable to the states by virtue of the Fourteenth Amendment. *Gitlow v. New York* (1925), 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138; *Lovell v. Griffin* (1938), 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949.

that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." (Emphasis sic.) *Press-Enterprise I*, 464 U.S. at 508, 104 S.Ct. 819, 78 L.Ed.2d 629.

**{¶17}** The right of access, however, is not absolute. The First Amendment qualifies the right by creating a presumption of openness that may be overcome "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Id. at 510, 104 S.Ct. 819, 78 L.Ed.2d 629; *State ex rel. Natl. Broadcasting Co. v. Lake Cty. Court of Common Pleas* (1990), 52 Ohio St.3d 104, 107, 556 N.E.2d 1120. Before determining whether the presumption of openness has been rebutted in this case, however, we must address the threshold issue of whether the juror questionnaires are part of the voir dire process and thereby subject to the right of qualified access.

**{¶18}** At the outset, we reiterate that *Press-Enterprise I* stands for the proposition that the voir dire examination of prospective jurors is presumptively open to the public. *Press-Enterprise I*, 464 U.S. at 505, 104 S.Ct. 819, 78 L.Ed.2d 629. Because the purpose behind juror questionnaires is merely to expedite the examination of prospective jurors, it follows that such questionnaires are part of the voir dire process. The fact that a lawyer elicits juror responses from written questions rather than oral questions has no bearing on whether the responses are considered in accepting or rejecting a juror.

**{¶19}** Accordingly, the First Amendment qualified right to open proceedings in criminal trials extends to prospective juror questionnaires. Consistent with our reasoning, we note that virtually every court having occasion to address this issue has concluded that such questionnaires are part of voir dire and thus subject to a

presumption of openness.[3] To be sure, "[t]he fact that the questioning of jurors was largely done in written form rather than orally is of no constitutional import." *Copley Press, Inc. v. Superior Court* (1991), 228 Cal.App.3d 77, 89, 278 Cal.Rptr. 443.

**{¶20}** Having concluded that the First Amendment guarantees a presumptive right of access to juror questionnaires, we next address whether the presumption was rebutted in this case. In a journal entry dated October 19, 2000, the trial court justified its seal order on "the extraordinary level of pretrial publicity requir[ing] the protection of the privacy of the jurors and [the preservation of] the independence and integrity of the jury." The trial court thus sealed the questionnaires and the list of juror names and addresses for the dual purpose of protecting juror privacy and preserving the right of the accused to a fair trial. Accordingly, we turn to whether these two justifications— analyzed separately—rebut the presumption of openness.

### a. Juror Privacy

**{¶21}** *Press-Enterprise I* addressed the proper balance between juror privacy and the First Amendment right of access to criminal proceedings. In framing the standard necessary to overcome the presumption of openness, the Supreme Court observed that "[t]he jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain." 464 U.S. at 511, 104 S.Ct. 819, 78 L.Ed.2d 629. Concluding that the trial court failed to establish such a compelling interest, the court noted that "not only was there a failure to articulate findings with the requisite specificity but there was also a failure to consider alternatives to closure and to total suppression of the transcript." Id.

---

3. See *United States v. McDade* (E.D.Pa.1996), 929 F.Supp. 815, 817, fn. 4; *United States v. Antar* (C.A.3, 1994), 38 F.3d 1348, 1359–1360; *Application of Washington Post* (July 23, 1992), D.C.Dist. No. 92-301, 1992 WL 233354; *Copley Press, Inc. v. Superior Court* (1991), 228 Cal.App.3d 77, 89, 278 Cal.Rptr. 443; *In re South Carolina Press Assn.* (C.A.4, 1991), 946 F.2d 1037, 1041; *Lesher Communications, Inc. v. Superior Court* (1990), 224 Cal.App.3d 774, 778, 274 Cal.Rptr. 154; *In the Matter of Newsday, Inc.* (1990), 159 A.D.2d 667, 669–670, 552 N.Y.S.2d 965.

at 513, 104 S.Ct. 819, 78 L.Ed.2d 629. *Press-Enterprise I* thus teaches that an individualized examination of each prospective juror's circumstances is appropriate in considering the privacy interests of such jurors. *Copley Press*, 228 Cal.App.3d at 86, 278 Cal.Rptr. 443.

{¶22} Applying this approach to the case sub judice, we conclude that the privacy interests of the prospective jurors, as articulated by the trial court, were not sufficiently compelling to rebut the presumption of openness. The trial court neither articulated particularized findings regarding the privacy interests of jurors nor considered alternatives to the total suppression of the questionnaires. Instead, the court denied access to all 290 questionnaires without limiting its order to the personal information that jurors have "legitimate reasons for keeping out of the public domain."[4] Id. at 511, 104 S.Ct. 819, 78 L.Ed.2d 629.

{¶23} To protect the legitimate privacy interests of jurors and, at the same time, preserve the right of access to criminal trials, we hereby adopt the procedure set forth by the Supreme Court in *Press-Enterprise I* to govern the administration of juror questionnaires. Consistent with *Press-Enterprise I*, trial judges should inform prospective jurors of their right to request an in-camera hearing, on the record and with counsel present, regarding any written question during the voir dire process. Id. at 512, 104 S.Ct. 819, 78 L.Ed.2d 629. "By requiring the prospective juror to make an affirmative request, the trial judge can ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy." Id. The trial judge should thereafter make a determination on the record as to whether a prospective juror has a legitimate privacy interest to warrant the nondisclosure of a response. If the trial judge finds a valid basis for nondisclosure, the judge should notify the prospective

---

4. After the trial court declared a mistrial and the Beacon Journal instituted this action, the court sent an inquiry to all members of the voir dire panel asking whether they would agree to have their identities and questionnaires released to the public. Of the 170 responses to this query, nine prospective jurors granted permission to release their names.

juror of his or her right to refrain from answering the question on the questionnaire form and should seal the hearing transcript.

{¶24} To the extent possible, trial courts should conduct these in-camera hearings in the same manner in which they conduct in-camera hearings at oral voir dire. We recognize, however, that certain differences between administering written questionnaires and conducting oral voir dire render strict uniformity impossible. Unlike oral voir dire, for example, written questionnaires are often received and completed by prospective jurors outside the courthouse. As a result, we defer to trial courts to establish the manner in which prospective jurors may request an in-camera hearing when completing juror questionnaires.

{¶25} Notwithstanding the foregoing procedure, we acknowledge that certain questions will invariably elicit personal information that is relevant only to juror identification and qualification rather than for the selection of an impartial jury. Accordingly, these questions—such as those that elicit Social Security number, telephone number, and driver's license number—are not properly part of the voir dire process and should be redacted from the questionnaires prior to disclosure.[5] Indeed, such information does nothing to further the objectives underlying the presumption of openness—namely, the enhancement and appearance of basic fairness in the criminal trial. In recognizing these per se exemptions, however, we limit our holding to questions that elicit information used for juror identification and qualification; to extend our holding to information that may be used in determining the impartiality of jurors would suppress information protected by the First Amendment.

{¶26} Finally, we reject respondents' argument that the prospective juror questionnaires should not be disclosed because they were completed pursuant to a promise of confidentiality. Constitutional rights are not superseded by the mere

---

5. This information was not solicited on the juror questionnaires distributed in preparation for the Ross trial.

promise of a trial judge to act contrary to those rights. Nevertheless, prospective jurors who disclosed sensitive information are entitled to an in-camera hearing before such information is released. In the future, trial courts should make no such promise of confidentiality, but instead conspicuously advise prospective jurors in writing that, notwithstanding the per se exceptions listed herein, their responses may be subject to public disclosure.

{¶27} Given that the trial court's order failed to rebut the First Amendment presumption of openness by its "juror privacy" justification, we consider whether the presumption was rebutted by virtue of the defendant's Sixth Amendment right to a fair trial.

### b. The Accused's Right to a Fair Trial

{¶28} The United States Supreme Court has observed that "[n]o right ranks higher than the [Sixth Amendment] right of the accused to a fair trial." *Press-Enterprise I*, 464 U.S. at 508, 104 S.Ct. 819, 78 L.Ed.2d 629. Nevertheless, the court has conceded that "the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the *voir dire* which promotes fairness." Id. In drawing the proper balance between the Sixth Amendment right to a fair trial and the First Amendment right of access, the court set forth a two-part inquiry to determine whether the presumption of openness has been rebutted:

{¶29} "If the interest asserted is the right of the accused to a fair trial, the * * * hearing shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Press-Enterprise II*, 478 U.S. at 14, 106 S.Ct. 2735, 92 L.Ed.2d 1.

{¶30} In the context of juror questionnaires, therefore, trial courts must (1) make specific findings, on the record, demonstrating that there is a substantial

probability that the defendant would be deprived of a fair trial by the disclosure of the questionnaires and (2) consider whether alternatives to total suppression of the questionnaires would have protected the interest of the accused.

**{¶31}** Applying this analytic framework to the instant matter, we find the record to be void of specific findings of prejudice or any consideration of less restrictive alternatives. Indeed, the traditional setting in which a defendant's right to a fair trial is prejudiced is when publicity "could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial." *Gannett Co., Inc. v. DePasquale* (1979), 443 U.S. 368, 378, 99 S.Ct. 2898, 61 L.Ed.2d 608. The instant matter, by contrast, involves information that is not only known to the prospective jurors, but was provided by them.

**{¶32}** Respondents nonetheless assert that prospective jurors, once aware that such questionnaires are subject to public disclosure, will be less forthcoming in their responses and thereby prejudice the right of the accused to a fair trial. As we have announced, however, prospective jurors will hereafter be made aware of their option to request an in-camera hearing regarding any written question. Consequently, such jurors will have no more incentive to withhold information from a questionnaire than they would at oral voir dire—where it is undisputed that the mere risk of untruthfulness does not give rise to a substantial probability of prejudice.

**{¶33}** Finally, we note that the trial judge in this case declared a mistrial and discharged the jury from service, thereby rendering the juror questionnaires immaterial to the defendant's right to a fair trial. Respondents counter that the juror questionnaires may prejudice the defendant if the same jurors are called to serve in the retrial of Denny Ross or if the prospective jurors in the retrial have been exposed to information concerning the discharged jurors. In such a case, however, the proper remedy would be a for-cause challenge against such jurors during the voir dire proceedings at the retrial.

2. The Jury List

**{¶34}** The Beacon Journal also contends that the First Amendment right of access extends to the list of juror names and addresses. Although the United States Supreme Court has not yet addressed this issue, a recent line of Supreme Court cases has acknowledged and gradually expanded the public's First Amendment right of access. See *Press-Enterprise II*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (holding that the First Amendment right of access extends to preliminary hearings); *Press-Enterprise I*, 464 U.S. at 510-511, 104 S.Ct. 819, 78 L.Ed.2d 629 (concluding that the right of access applies to the voir dire examination of jurors); *Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (striking down a statute that mandated the closure of trials during the testimony of minor victims of sex crimes); *Richmond Newspapers, Inc. v. Virginia* (1980), 448 U.S. 555, 561, 100 S.Ct. 2814, 65 L.Ed.2d 973 (invalidating a trial court's order to exclude the public from a murder trial).

**{¶35}** Consistent with the Supreme Court's emphasis on the openness of criminal proceedings, the majority of courts that have addressed this issue have recognized a right of access to juror names and addresses.[6] Such courts have concluded that the right of access extends to materials and information, apart from judicial proceedings, which fundamentally relate to the criminal process. Conversely, other courts have concluded that juror names and addresses are merely collateral information retained by courts for administrative purposes rather than records of judicial proceedings.[7] Thus, the divide among courts concerns the

---

6.     See, e.g., *In re Disclosure of Juror Names & Addresses* (1999), 233 Mich.App. 604, 592 N.W.2d 798; *Sullivan v. Natl. Football League* (D.Mass.1993), 839 F.Supp. 6; *In re Indianapolis Newspapers, Inc.* (S.D.Ind.1992), 837 F.Supp. 956, 958; *In re Globe Newspaper Co.* (C.A.1, 1990), 920 F.2d 88; *United States v. Doherty* (D.Mass.1987), 675 F.Supp. 719; *In re Baltimore Sun Co.* (C.A.4, 1988), 841 F.2d 74. Nevertheless, *Sullivan*, *Indianapolis Newspapers*, and *Doherty* imposed a brief moratorium after the verdict before releasing the jurors' names. At least one court has criticized such an approach for failing to adequately address threats on juror safety. *In re Disclosure*, 233 Mich.App. at 639, 592 N.W.2d 798.

7.     See, e.g., *Newsday, Inc. v. Sise* (1987), 71 N.Y.2d 146, 153, 524 N.Y.S.2d 35, 518 N.E.2d 930, fn. 4; *Gannett Co., Inc. v. State* (Del.1989), 571 A.2d 735.

threshold issue of whether juror names and addresses are the type of judicial records that trigger First Amendment analysis.

**{¶36}** Despite the administrative purpose of retaining juror names and addresses, we read *Press-Enterprise I* to explicitly include juror identity as part of the voir dire proceedings that should be analyzed under the First Amendment:

**{¶37}** "When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests. Even then a valid privacy right may rise to a level that part of the transcript should be sealed, *or the name of a juror withheld*, to protect the person from embarrassment." (Emphasis sic.) *Press-Enterprise I*, 464 U.S. at 512, 104 S.Ct. 819, 78 L.Ed.2d 629.

**{¶38}** As one scholar has noted, "[t]his passage has been read to imply that jurors' identities are part and parcel of voir dire, and as such are governed by the same principles of presumptive access." Weinstein, Protecting a Juror's Right to Privacy: Constitutional Constraints and Policy Options (1997), 70 Temple L.Rev. 1, 30. We nevertheless apply the "experience and logic" tests espoused in the *Press-Enterprise* cases to determine whether the juror names and addresses are subject to the First Amendment qualified right of access.

a. The "Experience" Analysis

**{¶39}** The "experience" element of the *Press-Enterprise* test—whether the information has historically been open to the press and general public—militates in favor of disclosure. In the days before the Norman Conquest, cases in England were heard before "moots," a "town meeting kind of body," which were not conducive to protecting participant identity. *Press-Enterprise I,* 464 U.S. at 505, 104 S.Ct. 819, 78 L.Ed.2d 629. A necessary incident of these public trials was that the public knew the identity and residence of the participants. Id. Indeed, juries

were drawn "*de corpore comitatus*"—from the county in which the dispute arose. 3 Blackstone (1769), Commentaries on the Laws of England 359-360.

{¶40} As the principles of our modern-day jury developed, tribunals began announcing the names of jurors during the selection process. *Gannett Co., Inc. v. State* (Del.1989), 571 A.2d 735, 756 (Walsh, J., dissenting). "Sir Thomas Smith, writing in 1565, describes the selection of jurors in vivid detail: 'The clarke * * * nameth all these that be on the quest [the jury]. The crier at everie name cryeth aloude * * * and then saith good men and true.' " Id. (Walsh, J., dissenting), quoting Smith (1585), *De Republica Anglorum* 99. This announcement of names occurred both during jury selection and when the jurors took oaths before the tribunal. Id.

{¶41} The tradition of access to jurors' identities continued in the new American nation. In the treason trial of Aaron Burr, for example, Chief Justice John Marshall printed the names of the jurors in the court's reported decision. *United States v. Burr* (1807), 25 F.Cas. 55, 87. Moreover, the Fourth Circuit recently observed that "[w]hen the jury system grew up with juries of the vicinage, everybody knew everybody on the jury and we may take judicial notice that this is yet so in many rural communities throughout the country." *In re Baltimore Sun Co.* (C.A.4, 1988), 841 F.2d 74, 75.

{¶42} In light of the foregoing, we conclude that the long tradition of access to juror names and addresses favors disclosure under the "experience" analysis of the *Press-Enterprise* test.

b. The "Logic" Analysis

{¶43} The "logic" element of the *Press-Enterprise* test—whether public access to the information plays a significant role in the functioning and enhancement of the judicial process—also militates in favor of disclosure. In *Richmond Newspapers*, 448 U.S. at 569-572, 100 S.Ct. 2814, 65 L.Ed.2d 973, the United States Supreme Court identified the following purposes served by

openness in criminal proceedings: (1) ensuring that proceedings are conducted fairly, (2) discouraging perjury, misconduct of participants, and unbiased decisions, (3) providing a controlled outlet for community hostility and emotion, (4) securing public confidence in a trial's results through the appearance of fairness, and (5) inspiring confidence in judicial proceedings through education on the methods of government and judicial remedies. See, also, *In re Globe Newspaper Co.* (C.A.1, 1990), 920 F.2d 88, 94. As the First Circuit stated in *Globe*, "many of the purposes listed above which open justice serves are equally served by access to the identities of the jurors. Knowledge of juror identities allows the public to verify the impartiality of key participants in the administration of justice, and thereby ensures fairness, the appearance of fairness and public confidence in that system." Id.

{¶44} Among the purposes served by access to juror identities is the preservation of fairness when suspicions arise that jurors were improperly selected from a narrow social group or from a particular organization. Indeed, "[i]t would be more difficult to inquire into such matters, and those suspicions would seem in any event more real to the public, if names and addresses were kept secret. * * * Juror bias or confusion might be uncovered, and jurors' understanding and response to judicial proceedings could be investigated. Public knowledge of juror identities could also deter intentional misrepresentation at voir dire." 920 F.2d at 94; see, also, *United States v. Doherty* (D.Mass.1987), 675 F.Supp. 719, 723.

{¶45} Furthermore, juror names and addresses are traditionally requested for the purpose of interviewing jurors about jury room deliberations, juror reaction to evidence, and—as in this case—juror misconduct. Information gained from these post-trial interviews plays a significant role in the function and enhancement of the judicial process. Post-verdict interviews may serve to uncover juror misconduct or provide insight on systemwide problems that may be the

subject of judicial or legislative reform. See Raskopf, A First Amendment Right of Access to a Juror's Identity: Toward a Fuller Understanding of the Jury's Deliberative Process (1990), 17 Pepp.L.Rev. 357, 372. One court has also noted that post-verdict interviews not only shed light on perhaps the most crucial aspect of a criminal prosecution, but also serve "to enhance the operation of the jury system itself by educating the public as to their own duties and obligations should they be called for jury service." *Doherty*, 675 F.Supp. at 723.

{¶46} Given the significant roles that information concerning juror identity plays in the enhancement of the judicial system, we conclude that the "logic" element of the *Press Enterprise* test also favors disclosure. Accordingly, we hold that the First Amendment qualified right of access extends to juror names and addresses, thereby creating a presumption of openness that may be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819, 78 L.Ed.2d 629. Because the trial court failed to articulate particularized findings that necessitated the total suppression of juror names and addresses, the jury list is subject to public disclosure absent findings that would rebut such a presumption.[8]

{¶47} Finally, to the extent that jurors may be harassed by individuals to whom such information has been disclosed, we have recognized that trial courts may "forbi[d] anyone to make 'repeated requests' that a juror discuss a case after the juror's refusal to do so" and may "instruct the jurors that they have no obligation to discuss the case with anyone." *State ex rel. Cincinnati Post v. Hamilton Cty. Court of Common Pleas* (1991), 59 Ohio St.3d 103, 105, 570 N.E.2d 1101. As we noted in *Cincinnati Post*, "[s]uch measures protect jurors from harassment without

---

8. Although the trial court sealed the juror names in its journal entry dated October 19, 2000, the court thereafter submitted to the jurors a form to permit disclosure of their names. Of the 12 jurors, ten agreed to have their names disclosed. The trial court thereafter disclosed the identity of those ten jurors.

violating First Amendment rights." Id. at 105-106, 570 N.E.2d 1101. Moreover, the Second Circuit has noted that "[h]uman nature is such that some jurors, instead of feeling harassed by post-trial interviewing, might rather enjoy it, particularly when it involves the disclosure of secrets or provides an opportunity to express misgivings and lingering doubts." *United States v. Moten* (C.A.2, 1978), 582 F.2d 654, 665.

### III. Remedy

{¶48} Having determined that the trial court's order is unconstitutional, we now consider the appropriate remedy. Because the Beacon Journal was not a party to the criminal action in the court of common pleas, it lacks standing to appeal the trial court's order. As a result, the Beacon Journal has suffered an injury for which there is no plain and adequate remedy at law, thereby necessitating an extraordinary form of relief. *Cincinnati Post*, 59 Ohio St.3d at 107, 570 N.E.2d 1101; *In re T.R.*, 52 Ohio St.3d at 11, 556 N.E.2d 439. To that end, the Beacon Journal filed a petition for a writ of mandamus seeking the disclosure of the jury questionnaires and the list of juror names and addresses.

{¶49} Mandamus is the appropriate remedy to compel compliance with the Public Records Act under R.C. 149.43. *State ex rel. Cincinnati Enquirer v. Krings* (2001), 93 Ohio St.3d 654, 657, 758 N.E.2d 1135. Moreover, we have held that mandamus is the proper remedy when a right of access is predicated on a constitutional challenge. *State ex rel. Scripps Howard Broadcasting Co. v. Cuyahoga Cty. Court of Common Pleas, Juv. Div.* (1995), 73 Ohio St.3d 19, 652 N.E.2d 179.

{¶50} Nevertheless, the court of appeals construed the Beacon Journal's writ of mandamus as a writ of prohibition because "relator [sought] to prevent enforcement of the trial court's orders." In arriving at this conclusion, the court of appeals observed that "[t]he Ohio Supreme Court has repeatedly noted that the proper remedy to prevent enforcement of such order is prohibition, not

mandamus," citing *In re T.R.*, 52 Ohio St.3d 6, 556 N.E.2d 439, paragraph one of the syllabus; *State ex rel. Dayton Newspapers, Inc. v. Phillips* (1976), 46 Ohio St.2d 457, 75 O.O.2d 511, 351 N.E.2d 127, paragraph one of the syllabus. The decisions on which the court of appeals relies, however, are distinguishable from the case at bar. In those cases, we granted writs of prohibition to invalidate closure and gag orders issued by the trial courts. *In re T.R.*, 52 Ohio St.3d at 10-11, 556 N.E.2d 439; *Dayton Newspapers*, 46 Ohio St.2d at 458, 75 O.O.2d 511, 351 N.E.2d 127. Although prohibition is the appropriate remedy to invalidate such orders, mandamus is the appropriate vehicle to compel disclosure of specific records requested under the Ohio Public Records Act and the Ohio and United States Constitutions. *State ex rel. News Herald v. Ottawa Cty. Court of Common Pleas* (1996), 77 Ohio St.3d 40, 45, 671 N.E.2d 5. To the extent that the trial court's seal order violates such statutory and constitutional directives, therefore, we grant the writ of mandamus.

## IV. Conclusion

{¶51} In sum, we affirm the judgment of the court of appeals denying access to the completed juror questionnaires and the list of juror names and addresses under R.C. 149.43. We reverse the judgment of the court of appeals denying access to the juror questionnaires without responses under R.C. 149.43. Based on the Ohio and United States Constitutions, we affirm the judgment granting access to the juror questionnaires and reverse the judgment denying access to the list of juror names and addresses. The juror questionnaires and the list of juror names and addresses should be disclosed only after the necessary precautions have been taken to ensure that the presumption of openness is not rebutted "by an overriding interest based on findings that closure is essential to preserve higher values

and is narrowly tailored to serve that interest."[9] *Press-Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819, 78 L.Ed.2d 629.

Judgment affirmed in part

and reversed in part.

DOUGLAS, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in syllabus and judgment.

RESNICK, J., concurs in paragraph two of the syllabus and judgment.

_____

Edward G. Kemp and Karen C. Lefton, for appellee and cross-appellant.

Sherri Bevan Walsh, Summit County Prosecuting Attorney, Holly Ensign Reese and Sandy James Rubino, Assistant Prosecuting Attorneys, for appellant and cross-appellee.

Baker & Hostetler LLP and David Lindsey Marburger, for amici curiae Ohio Coalition for Open Government and Ohio News Association.

Timothy Daly Smith, for amicus curiae Ohio Citizens for Honesty, Integrity and Openness in Government, Inc.

John C. Weisensell, for amicus curiae Summit County Trial Lawyers Association.

_____

---

9.      Consistent with the procedure set forth in Part II(B)(1)(a), the trial court should inform the 290 prospective jurors of their right to request an in-camera hearing on the record regarding any question answered on the juror questionnaire form. The trial court should inform the 12 impaneled jurors of their right to request an in-camera hearing on the record regarding the release of their names and addresses. Based on these hearings, the trial court should determine whether nondisclosure of any name, address, or questionnaire response gives rise to an "overriding interest based on findings that closure is essential to preserve higher values." *Press-Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819, 78 L.Ed.2d 629. If the trial court finds a basis for nondisclosure under this standard, the court should seal the relevant information and the hearing transcript.